COMMONWEALTH vs. KENNETH A. APPLEBY.

Hampden. January 4, 1983. — June 8, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law,* Assistance of counsel, Waiver of constitutional rights. *Evidence,* Relevancy and materiality, Photograph, Cross-examination, Hostile witness. *Practice, Criminal,* Continuance, Examination of jurors, Fair trial, Instructions to jury, Mistrial, Attendance of witnesses. *Witness,* Refreshment of recollection.

A criminal defendant who expressed dissatisfaction with his court-appointed attorney, whom a judge found to be competent, and who also stated that, rather than accept the attorney, he would represent himself, had no constitutional right to have alternate counsel appointed and, in the circumstances, the judge did not err in concluding that the defendant had waived his right to counsel and in requiring him to proceed pro se, with the attorney standing by to assist him. [366-370]

A judge did not abuse his discretion in denying a defendant's motion for a continuance of his criminal trial, where it appeared that the defendant, who was proceeding pro se, was responsible for any lack of trial preparation on his part. [370-372]

At the trial of indictments for kidnapping and rape, where the judge had asked each prospective juror individually a series of questions satisfying constitutional and statutory requirements, there was no error in his refusal to ask additional questions submitted by the defendant. [372-373]

At the trial of indictments for kidnapping and rape, no error appeared in the admission of evidence of a cloth doll bearing the name of the witness who later testified to being the defendant's coparticipant in the crimes, where the doll was relevant as corroboration of the victim's testimony that the witness had been at the crime scene and where the judge implicitly found that the doll's probative value outweighed any prejudicial effect of associating the defendant with black magic. [374-375]

At the trial of indictments for kidnapping and rape, the judge did not abuse his discretion in admitting a letter signed by the defendant's coparticipant in the crimes and characterized by the defendant as a "pledge of allegiance to the Nazi party," for the limited purpose of corroborating the coparticipant's testimony concerning it. [375-376]

At the trial of indictments for rape and kidnapping, there was no error in admitting in evidence handcuffs and shackles which the victim identified as either having been used to bind him, or similar to others so used. [376-377]

At the trial of indictments for rape and kidnapping, there was no error in admitting in evidence five photographs taken at the defendant's residence, which were relevant to corroborate the testimony of the victim. [377]

At the trial of indictments for rape and kidnapping, a "will" offered for the purpose of contradicting a witness's testimony that he had been "enslaved" by the defendant would have been merely cumulative of other evidence, and thus any error in its exclusion was harmless beyond a reasonable doubt. [377]

At a criminal trial no error appeared in the judge's denial of motions for a change of venue or dismissal based on pretrial publicity. [377-378]

At a criminal trial, the judge did not improperly restrict cross-examination of the victim, or abuse his discretion by refusing to have the victim recalled from another State for additional cross-examination. [378]

In the circumstances of a trial of indictments for kidnapping and rape, no substantial risk of a miscarriage of justice resulted from the judge's omission of jury instructions respecting assault and battery as a lesser included offense to rape. [379]

At a criminal trial no error appeared either in a witness's use of grand jury minutes to refresh his recollection or in the judge's sustaining the witness's claim of an attorney-client privilege in response to questions why and by whom he was given the minutes. [379]

Testimony concerning the defendant's flight was properly admitted at a criminal trial as evidence of consciousness of guilt. [379-380]

At a criminal trial there was no error in the judge's denial of the defendant's motion for a mistrial, following a witness's remark that the defendant had held a gun to his head, where the defendant, following denial of his motion, neither moved to strike the remark nor requested curative instructions to the jury. [380]

The judge at a criminal trial did not abuse his discretion by refusing the defendant's request that subpoenas be issued for certain out-of-State witnesses, where the subpoenas were not requested until after trial began and where the testimony sought either did not relate to a material issue, or was not shown to be relevant or competent. [380-381]

At a criminal trial, the judge did not abuse his discretion by refusing the defendant's request that he declare the defendant's admitted coparticipant in the crimes to be a hostile witness. [381]

INDICTMENTS found and returned in the Superior Court Department on July 13, 1978.

The cases were tried before *Tamburello, J.*, and a motion for revision of sentence was heard by *Moriarty, J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Lois M. Lewis* for the defendant.

*Dianne M. Dillon*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. The defendant, Kenneth A. Appleby, appeals from his convictions of rape and kidnapping.[1] He raises numerous issues concerning the right to counsel at trial, procedure, and evidence. We affirm.

The facts are sordid. For present purposes, we need give only an outline of the evidence. Facts pertinent to the issues raised will appear in appropriate sections of this opinion. In the early morning hours of October 22, 1977, the victim, a resident of New York city, was abducted from that city by the defendant and another person, James Carey Junkin, and taken by car to a house in West Springfield, Massachusetts. During the trip, the victim was at various times blindfolded, handcuffed, gagged, beaten, and forced to swallow pills. He was unconscious for a good part of the trip. Once at the house, the victim was interrogated, shackled, disrobed, and forced by Appleby and Junkin to submit to repeated acts of fellatio and sodomy. He was eventually taken to a woodshed and left there at least overnight, still blindfolded and shackled. When released from the shed, he was again interrogated and drugged. Appleby made statements to the effect that he would use torture to dominate the victim. Finally, the victim was put into a car and driven to a city that he recognized as Hartford, Connecticut, when his blindfold was removed. He was given money for bus fare to New York city when he was freed. He returned to New York city by bus and he reported the incident to the New York city police within a few days. In

---

[1] Appleby was also tried on five indictments charging assault and battery by means of a dangerous weapon. He was acquitted of two of these charges. On each of the remaining three indictments, he was convicted of assault and battery. The indictments were placed on file with his consent and are therefore not before us on appeal. *Commonwealth* v. *Delgado*, 367 Mass. 432, 438 (1975).

December, 1977, the victim underwent surgery to remove a testicle which had been causing him pain since the incident.

The defendant was tried before a jury in the Superior Court in Hampden County from January 21, 1980, to February 8, 1980. Upon conviction, the defendant was sentenced to the Massachusetts Correctional Institution at Walpole for eighteen to twenty-five years for rape and eight to ten years for kidnapping, the sentences to be served concurrently. On a motion to revise and revoke the sentence on the rape conviction, a different Superior Court judge imposed a term of ten to twelve years.[2] It appears that the motion to revise and revoke the sentence on the kidnapping conviction had been continued at the request of the defendant. The disposition as to the assault and battery indictments was not disturbed. After Appleby filed his appeal, we took the case on our own motion. G. L. c. 211A, § 10(A).

A. *The Right to Counsel and the Motions for Continuance.*

Appleby claims that the "trial court"[3] erred in denying his appointed counsel's requests to withdraw and in denying Appleby's request for other counsel. He also argues that the trial judge abused his discretion by failing to allow continuances of the trial in order to permit the defendant and the appointed counsel sufficient time to prepare.

The indictments in this case were returned in July, 1978. From that time until October 17, 1979, Appleby was represented by three different attorneys who apparently were

---

[2] The Commonwealth filed an appeal from the allowance of the motion to revise and revoke, and we allowed the Commonwealth's application for direct appellate review. The Commonwealth, however, did not file a brief. At oral argument before the court, defense counsel moved that this appeal be dismissed. We took the matter under advisement and we now dismiss the Commonwealth's appeal. Mass. R. A. P. 19 (c), 365 Mass. 867 (1974).

[3] It is apparent that Appleby uses this phrase to refer to the different judges of the Superior Court who heard and denied the various motions to withdraw and to appoint other counsel, and we so construe the phrase. Although Appleby uses the same term in his argument on the denial of the motions for continuance, the only such denials properly before us were made by the trial judge. See note 19, *infra.*

privately retained. During this period, a number of discovery and procedure motions were filed.[4] Although the record is unclear as to why the first attorney withdrew, Appleby at some point fired the second and third attorneys.[5]

On October 17, 1979, Attorney Peter Rutherford of the Massachusetts Defenders Committee was appointed to represent Appleby. There was, at first, a question whether Appleby was entitled to appointed counsel but, after an investigation by the probation department, it appears that a judge determined in early November, 1979, that Appleby was indigent.[6] Between October 17 and November 30, 1979, the defendant filed more motions, and at some point, trial was scheduled for January 7, 1980.

On November 30, Mr. Rutherford filed a "motion to disappear" on the ground he could not adequately represent Appleby because Appleby had expressed a lack of confidence in the attorney's ability.[7] A judge denied the mo-

---

[4] These included motions for change of venue or "adjournment on ground of prejudice" which were denied. On July 20, 1979, the defendant filed a motion for speedy trial, which was allowed on September 4, 1979, at the same time that a second motion for a change of venue was denied. On September 21, 1979, the defendant's motion "for continuance to insure the interests of Justice" was denied.

[5] The two attorneys were apparently associates. They represented Appleby in late 1978 at his trial for charges of assault and battery by means of a dangerous weapon stemming from unrelated incidents. As of March 15, 1979, both attorneys had filed appearances on behalf of Appleby in the present matter. One of the attorneys was allowed to withdraw as of May 7, 1979, and the other as of October 17, 1979.

[6] The docket entries reflect that there was an investigation but do not reveal whether a determination of indigency was made. We take the information concerning the determination of indigency from a statement made by Mr. Rutherford at a later hearing.

[7] Mr. Rutherford said that he had been informed that Appleby had sent three pro se petitions to this court, seeking a change of venue, a stay of proceedings, and a writ of habeas corpus. A single justice of this court ordered the petitions returned to Appleby with instructions that he file any further petitions through his appointed counsel. Appleby returned the petitions to this court with a cover letter stating that Mr. Rutherford had refused to file the petitions and that Appleby considered Mr. Rutherford incompetent.

Mr. Rutherford told the motion judge that he had thought it "would be premature to pursue these matters, frankly, to run in to the Supreme

tion, declaring his belief in Mr. Rutherford's ability.   The
judge then gave Appleby the choice to proceed pro se or to
accept Mr. Rutherford's representation.[8]   Later in the hear-
ing Appleby asked if he would be permitted to file pro se
motions, and the judge told him he would.   The judge in-
structed Mr. Rutherford to stay in the case and to take an
active role in advising Appleby.   When Mr. Rutherford ex-
pressed doubts concerning the arrangement, the judge
stated that in making his decision he had considered the
feelings of Mr. Rutherford and Appleby and "the ad-
ministration of the Court and the procedure of cases to trial
and the potential for delay and miscarriage of justice."   Ap-
pleby did not protest the judge's decision, and it was clear
that the trial was to commence on January 7, 1980.

On January 7, 1980, Appleby was arrested at the Cana-
dian border in the State of Washington.[9]   When he did not
appear at trial that morning, a default warrant was issued.
At a hearing on that date before a second Superior Court

---

Judicial Court every time a motion is acted on in this Court, which is not
acceptable to him."   Mr. Rutherford did not believe he could adequately
defend Appleby because the impact of the accusations in the letter
"destroys any kind of attorney-client relationship."   Although Appleby
has not argued here that Mr. Rutherford's refusal to file the motions
denied him the effective assistance of counsel, we note that counsel cannot
be expected to appeal the denial of every pretrial motion in order to pro-
tect himself from claims of ineffective assistance, see *Commonwealth* v.
*Saferian,* 366 Mass. 89, 98-99 (1974), nor is it "ineffective assistance of
counsel when trial counsel declines to file a motion with a minimal chance
of success."   *Commonwealth* v. *Conceicao,* 388 Mass. 255, 264 (1983).

[8] The following colloquy ensued:

THE JUDGE:  "I should point it out.   Do you understand what I mean by
pro se, Mr. Appleby?"
THE DEFENDANT:  "Represent myself, Your Honor."
THE JUDGE:  "Yes."
THE DEFENDANT:  "I'd rather represent myself than have Attorney
Rutherford."
THE JUDGE:  "All right.   That may be your option, then."

[9] We take this information from the assistant district attorney's state-
ment at a hearing on January 7.   Appleby does not dispute this informa-
tion.

judge, Mr. Rutherford renewed his motion to withdraw on
substantially the same grounds as before, and the motion
was again denied. Appleby waived extradition from Wash-
ington and was present for a hearing before the same judge
on January 14. At this hearing, and at hearings held by that
judge on January 17 and 18, and by the trial judge on
January 21 and 22, Mr. Rutherford presented motions to
withdraw and Appleby presented motions to appoint dif-
ferent counsel. Mr. Rutherford and Appleby emphasized
that a breakdown of the attorney-client relationship be-
tween them had occurred and that they were not prepared
for trial. The motions were all denied.

As of January 14, 1980, Appleby had not quarreled with
the notion that he was representing himself with Mr. Ruth-
erford as standby adviser, although Appleby said he wanted
another lawyer and had decided to proceed pro se only
because he did not want Mr. Rutherford to represent him.[10]
He did not request a continuance, however. At the January
17 hearing, Appleby stated that Mr. Rutherford, or any at-
torney from the Massachusetts Defenders Committee,
would be unable to represent him adequately because they
could not understand, and might be repulsed by, the homo-
sexual and sadomasochistic aspects of the case. He claimed
that such an understanding was necessary because "[t]his is
a positive defense. It's consensual relationship." When
Appleby said that he did not wish to represent himself, the
judge instructed Mr. Rutherford that he was to represent
Appleby.

In his remarks on January 21[11] and 22, the trial judge said
that he had read the more than fifty motions that had been

---

[10] On January 17, Appleby told the judge that Mr. Rutherford was not
his attorney, that he wanted another attorney, and that he was repre-
senting himself only because of the breakdown in his relationship with
Mr. Rutherford.

[11] On January 21, Mr. Rutherford informed the trial judge that another
attorney from the Massachusetts Defenders Committee had earlier that
day brought a petition before a single justice of this court to allow Mr.
Rutherford to withdraw. The petition was denied.

filed by Appleby and his various attorneys. His opinion was that Appleby had apparently caused many of his own problems and "seem[ed] to be creating this delay." He noted that Appleby had "had many hearings before many judges on the same matters we're talking about today." The judge further noted that Mr. Rutherford, whom he characterized as a highly competent attorney, was in the case for all purposes as of January 17, 1980. The judge said that Appleby had the right to conduct his own defense but that Mr. Rutherford was his attorney and, rather than being a passive adviser, Mr. Rutherford would be expected to make suggestions for the conduct of trial as though he were participating in it as counsel.

At a lobby conference the next day, Appleby and Mr. Rutherford again voiced their objections to the situation. When Appleby stated that he did not consider Mr. Rutherford to his attorney and did not want Mr. Rutherford to speak on his behalf, the judge instructed Mr. Rutherford "to stand by as counsel, and . . . to give . . . advice at all times." The empanelment of the jury was commenced following this conference.

1. *Assistance of counsel.* The assistance of counsel is "deemed necessary to insure fundamental human rights of life and liberty." *Johnson* v. *Zerbst,* 304 U.S. 458, 462 (1938). It is a right accorded to every defendant, rich or poor, and zealously safeguarded by the Sixth and Fourteenth Amendments to the United States Constitution. *Faretta* v. *California,* 422 U.S. 806 (1975). *Gideon* v. *Wainwright,* 372 U.S. 335 (1963). However, a defendant may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. *Faretta* v. *California, supra.* An indigent defendant has the right to appointed counsel, *Gideon* v. *Wainwright, supra,* but he has no right to dictate who shall be appointed to represent him. *Commonwealth* v. *Drolet,* 337 Mass. 396, 400-401 (1958). "While a defendant may not be forced to proceed to trial with incompetent or unprepared counsel, . . . a refusal without good cause to proceed with able appointed counsel

is a 'voluntary' waiver." *Maynard* v. *Meachum*, 545 F.2d 273, 278 (1st Cir. 1976). In the present case, we conclude that Appleby's failure to proceed with Mr. Rutherford as of November 30, 1979, was without good cause and constituted a waiver of his right to counsel.[12]

The only issue for decision at the hearing on November 30, 1979, was whether Mr. Rutherford, on his own motion, should be allowed to withdraw. Although Appleby was evidently dissatisfied with Mr. Rutherford, he did not request that a new lawyer be appointed at that time. The judge found that Mr. Rutherford was a competent attorney. There was no indication that either Appleby or Mr. Rutherford could not be prepared for trial on January 7, 1980. Indeed, from the number of motions filed between the time Mr. Rutherford was appointed on October 17, 1979, and the hearing on November 30, 1979, it is apparent that significant preparations for trial were being made.

Unlike the defendant in *Commonwealth* v. *Cavanaugh*, 371 Mass. 46 (1976), Appleby was not presented with a "Hobson's choice" of representing himself or of going forward with incompetent or unprepared counsel. *Id.* at 53-54. Appleby's apparent dissatisfaction with Mr. Rutherford and his statement that he would rather represent himself than accept Mr. Rutherford does not compel a conclusion that Mr. Rutherford's representation of Appleby was or would be incompetent or otherwise deficient. We can see no basis for inferring from this record that, as of November 30, Appleby had a constitutional right to have alternate counsel appointed.[13] Moreover, it is apparent from the judge's remarks on November 30, 1979, that he reluctantly denied Mr. Rutherford's motion to withdraw because of his concern, based on his knowledge of a number of other motions filed by Appleby, that Appleby was using

---

[12] We examine the consequences of this waiver, *infra*.

[13] Given Appleby's later claim that no attorney from the Massachusetts Defenders Committee could adequately present his defense, it is unlikely that he would have accepted alternate counsel from this source in any event.

the motions as a way of delaying trial. In this context, the judge's offer to allow Appleby the choice between going forward pro se or accepting Mr. Rutherford's services was proper. "A criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive." *Maynard* v. *Meachum*, 545 F.2d 273, 278 (1st Cir. 1976). See *Commonwealth* v. *Jackson*, 376 Mass. 790, 796 (1978), and cases cited.

We have noted that at the November 30 hearing Appleby did not protest the judge's decision to require him to choose. We do not imply that Appleby waived his right to counsel by his silence. Such an implication might be constitutionally offensive. *Carnley* v. *Cochran*, 369 U.S. 506, 516 (1962). However, the determination of waiver may properly be based on "the background, experience, and conduct of the accused" and the circumstances of the case. *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938). The record indicates that Appleby had two years of college education and was "literate, competent, and understanding." *Faretta* v. *California*, 422 U.S. 806, 835 (1975). It is also clear from Appleby previous encounters with the court and his prior dealings with various attorneys that he "was adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation." *Commonwealth* v. *Jackson*, 376 Mass. 790, 795 (1978). See *Maynard* v. *Meachum, supra* at 278-279.

The fact that Appleby refused to sign a waiver form is not conclusive of a lack of waiver, see *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 368 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910 and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972), especially given his failure to protest.[14] Nor did Appleby

---

[14] At the close of the November 30 hearing, the judge asked Appleby if he had "anything else" to say. Appleby replied in the negative. In light of Appleby's outspokenness at the later hearings, we think that his reticence on this occasion derived more from his agreement with the outcome of the hearing than from resignation in the face of it.

advance any reason of his own as to why he was dissatisfied, although he was given at least two opportunities to speak.[15] Compare *Commonwealth* v. *Moran,* 388 Mass. 655, 657-658 (1983). If we take as true Appleby's later contention that Mr. Rutherford would be unable to understand the nature of the defense Appleby wished to present,[16] we would not regard that as an appropriate basis for requiring the appointment of alternate counsel.[17] Although Appleby claimed on January 14 that he had problems communicating with Mr. Rutherford (see note 20, *infra*) and on January 17 that there was a "complete breakdown" in his relationship with Mr. Rutherford, he did not mention such a breakdown at the hearing on November 30.[18] The hearing judge on November 30 did not err in concluding that Appleby had waived his right to counsel. It was therefore not improper for that judge and succeeding judges to deny Mr. Rutherford's motions to withdraw and to require him to serve as standby counsel.

---

[15] At this hearing Appleby did attempt to introduce a letter written to Mr. Rutherford by one of Appleby's former attorneys in which, apparently, criticisms of Mr. Rutherford were made. The judge refused to put the contents of the letter on record, stating that he considered the allegations contained in it completely false, and he acknowledged that the matter had been previously discussed at a lobby conference.

[16] At the hearing on January 17, Mr. Rutherford responded in the negative when the judge asked him whether he was revolted by the "alleged crime or the alleged details." In response to a statement by the judge, Mr. Rutherford also acknowledged that there was nothing in the case which would indicate that he could not adequately represent Appleby.

[17] In the present case, Appleby did not present a defense based on consent but instead denied that he participated in any allegedly criminal conduct. In these circumstances, we do not understand how Mr. Rutherford's supposed lack of understanding of homosexual and sadomasochistic life-styles could have hindered his representation of Appleby.

[18] We note that the trial judge, who had extensively reviewed the record, specifically indicated his disbelief that such a breakdown had occurred. When Appleby made this claim, the judge responded: "I like the words you're using. I like the place they came from, but I'd like to believe that they are applicable to your case."

As of November 30, when Appleby waived his right to counsel, the trial was scheduled to begin on January 7. Because Appleby had fled the jurisdiction, trial did not begin on that date. In these circumstances, we think that Appleby's later claims of communication problems and "complete breakdown" and his requests for an appointed attorney came "within the broad discretionary power of a court over requests for last-minute shifts in representation which threaten to delay a proceeding." *Commonwealth* v. *Jackson,* 376 Mass. 790, 796-797 (1978), and cases cited. The judges who ruled on the motions were justified in concluding that the motions were made as dilatory tactics even if the effect of the denials was to leave Appleby without counsel. See *Commonwealth* v. *Jackson, supra* at 796.

2. *Motions for continuance.* We can see no error in the trial judge's denials of the motions for continuances.[19] Such motions are addressed to "the sound discretion of the judge, whose action will not be disturbed unless there is a patent abuse of discretion." *Commonwealth* v. *Funderberg,* 374 Mass. 577, 580 (1978). The denials here did not operate "as to impair the constitutional right to have counsel who has had reasonable opportunity to prepare a defense." *Commonwealth* v. *Cavanaugh,* 371 Mass. 46, 51 (1976). As of September 4, 1979, when his motion for speedy trial was allowed, Appleby was on notice that the case would be called for trial in the near future. The denial of his motion for a continuance on September 21 gave him further notice. Although Appleby was granted a continuance from October

[19] The dockets contain no references to motions for continuance after November 30, and Appleby makes no argument with respect to any such motions prior to that date. On January 18, however, the hearing judge indicated that he would take no action on Appleby's motion for continuance because a petition for a stay had been brought before a single justice of this court who had not yet ruled. The petition was denied. On January 21, 1980, the trial judge denied Appleby's apparently oral motion for a continuance. The matter of a continuance was also discussed on January 22 and 23, but it is unclear whether Appleby made separate motions for continuance on those dates. We assume that whatever motions for continuance Appleby made before the trial judge on those dates were denied.

24 to November 5, the denial of his motion for continuance on November 15 reaffirmed that trial was imminent. Appleby did not indicate at the hearing on November 30 that he could not be ready for trial on January 7, and the record indicates that a number of discovery and procedural motions had been filed by that time. Any lack of preparedness on Appleby's part or on the part of Mr. Rutherford from the time of that hearing until January 17 can be attributed to Appleby, who was acting pro se during that time and who bore the risk of his own failure to prepare or to cooperate with Mr. Rutherford.[20] See *Commonwealth* v. *Blasser*, 2 Mass. App. Ct. 754, 758-760 (1975).

The trial judge indicated that he would do all that he could to see that Mr. Rutherford was furnished with what-

---

[20] On January 17, Mr. Rutherford claimed that he was unprepared because he had not yet received copies of the victim's criminal records, if any. At later hearings he claimed that he had been unable to interview Junkin and had not had time to develop rebuttal to any consciousness of guilt evidence the Commonwealth might try to introduce concerning Appleby's default and arrest in Washington on January 7.

As to the first two claims, the record indicates that the Commonwealth had attempted to locate the criminal records of the victim, had been frustrated by their lack of information concerning him, and had been unable to find any such record, and that Junkin was apparently at sea at the time of the hearings. Even if Junkin's whereabouts had been known, the Commonwealth could not, of course, force him to talk with Appleby or his counsel. As to the third claim, the judge need not have allowed Mr. Rutherford extra time to prepare evidence concerning a situation which Appleby himself created.

At the hearing on January 21, Mr. Rutherford stated that Appleby had not been in contact with him between November 30 and January 14. Appleby had contended on January 14 that "Mr. Rutherford will not advise me. I've received a letter from him that he wants any questions in writing. I've called him a number of times and couldn't get any advice. I have no one to advise me even on the voir dire questions . . . ." Mr. Rutherford responded that he had drawn up and filed voir dire questions which were not satisfactory to Appleby and that the only call from Appleby of which he was aware had occurred when he was out of the office and the secretary refused to accept the telephone charges. The record indicates that Mr. Rutherford was present and available to Appleby at all times during the trial and that a number of Appleby's present claims of error are based on observations and suggestions made by Mr. Rutherford at trial.

ever information he needed. He also offered Appleby a few days to discuss the case with Mr. Rutherford, but Appleby refused, saying he did not want Mr. Rutherford to represent him because of the "irreconcilable breakdown." In making his decision, the trial judge noted that the "case has been lingering in this court since 1978" and that he was "not going to plow the same ground . . . plowed before the other . . . Judges." It is apparent that he balanced the claims of Appleby and Mr. Rutherford, on the one hand, against the rights of the Commonwealth, on the other.[21] See *Commonwealth* v. *Cavanaugh*, 371 Mass. 46, 51 (1976). The judge's determination that the interests of the Commonwealth in an orderly and expeditious trial outweighed the defendant's reasons for a continuance was, on these facts, not an abuse of discretion.[22]

B. *The Voir Dire Examination of Prospective Jurors.*

The defendant contends that the judge's questions on voir dire were insufficient in light of the extensive publicity and the "sensational aspects of homosexuality, the black arts and Naziism." Although during empanelment there was discussion of voir dire questions submitted by Appleby, the record does not contain a copy of any questions he submitted. Nor

---

[21] The assistant district attorney informed the trial judge that the victim and two other witnesses had been summoned from out of State to appear and that the Commonwealth desired a speedy trial because there was "a risk we'll lose our victim." On January 17, the assistant district attorney had informed the motion judge that the victim had been postponing surgery in order to attend trial. The trial judge apparently had transcripts of the January 17 hearing available to him.

[22] We also see no abuse of discretion in the judge's denial of Appleby's motions for continuance, based on his claim of illness, during trial. The judge did, in fact, give Appleby one day off from trial and he shortened the proceedings on the next day. On that day, the judge also spoke by telephone with a nurse for the doctor who had examined Appleby, and the judge questioned a State health worker who had also examined Appleby. The judge concluded that Appleby could proceed with trial and stated that he would recess early and give consideration to requests for recesses during the day. When Appleby next complained of illness, the judge granted a recess and, when trial resumed, Appleby agreed to continue after the judge stated that he would recess for the day if Appleby could not proceed.

does the record reveal any mention of Naziism or the "black arts" prior to the voir dire. We have also not been supplied with any documentation concerning the nature and extent of the publicity that the case received. The judge did reveal the nature of the charges to the assembled venire, and he asked them generally if any of them were aware of any bias or prejudice, or whether any one would be too embarrassed by the nature of the evidence to serve on the jury. He also asked each juror individually a series of questions which satisfied the constitutional and statutory requirements for jury selection.[23] See *Commonwealth* v. *Sowers*, 388 Mass. 207, 210-214 (1983); G. L. c. 234, § 28. The number and form of the questions to be asked on voir dire are within the discretion of the judge. *Commonwealth* v. *Sowers, supra* at 213. There was no error in the judge's refusal to ask all the voir dire questions submitted by Appleby. See *Commonwealth* v. *Hobbs*, 385 Mass. 863, 872-875 (1982). Although a number of jurors indicated that they had seen or read something about this case, about Appleby's flight to Washington, or about his previous case, all those who were declared indifferent by the judge stated that this information would not affect their judgment or that they knew of no reason why they could not judge the case fairly and impartially. See *Commonwealth* v. *Jackson*, 376 Mass. 790, 799 (1978). "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy* v. *Florida*, 421 U.S. 794, 799-800 (1975). We note also that the jurors were sequestered during trial, and there is no contention that prejudicial material reached them.[24]

---

[23] The judge asked each juror individually whether he or she could fairly and impartially consider the testimony of homosexual persons or of the defendant if he should testify; whether he or she had seen or read about the case and, if so, whether that report would affect his or her judgment, or whether he or she was aware of any reason why he or she could not fairly and impartially judge the case on the evidence. The judge also asked each juror a question designed to elicit whether he or she could apply the law as the judge gave it regardless of personal opinion.

[24] The defendant does contend that one of the jurors selected to sit made a "prayerful gesture" at Mr. Rutherford as the juror left the courtroom

C. *The Admission and Exclusion of Certain Items of Physical Evidence.*

Appleby claims error in the judge's admission and exclusion of certain items as physical evidence.

1. A Massachusetts State police officer who had participated in a search of Appleby's home in June, 1978, identified at trial a white cloth "voodoo" doll[25] as one he had found in Appleby's safe. When found, the doll bore the name James Carey Junkin. The doll was marked for identification and subsequently admitted in evidence over Appleby's objection and motion for mistrial.

Appleby now contends that the admission of the doll was highly prejudicial because "[t]he doll displayed various black magic incantations." Aside from Junkin's name, the only words now visible on the doll are "Venus Here [*sic*] Me," which are printed on the back. Appleby has not directed us to any place in the record where there is mention of black magic or voodoo prior to the time the doll was admitted. Indeed, these topics apparently did not arise until Appleby later questioned Junkin[26] in what Appleby asserts

---

and that a cheer arose from the jury room as that juror entered. At Mr. Rutherford's suggestion, Appleby moved for a mistrial and the judge denied the motion. There was no error. The judge called the jurors into the courtroom and asked them collectively if any of them had discussed the case. The jurors replied in the negative. Absent any indication that the juror's gesture and the subsequent cheer from the jury room were in any way connected with the case, the judge's questioning of the jury was an appropriate method to determine whether an extraneous issue might have influenced the jury. The jurors' negative response justified the denial of the motion for mistrial. See *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978); *Commonwealth* v. *Eagan*, 357 Mass. 585, 588-589 (1970).

[25] When the doll was introduced it was not identified as a "voodoo" doll. The term "voodoo" was first used by Junkin during direct examination by Appleby.

[26] Junkin surrendered himself to Massachusetts authorities on the morning of February 1, 1980. Prior to that time, all efforts to locate Junkin had failed. On January 30, the judge informed Appleby and the attorneys that an attorney whom the judge had appointed at Appleby's request had succeeded in speaking with Junkin's father and an acquaintance of Junkin but that neither had been able to supply his address.

was an effort to counteract the effect of the doll's admission. There was no error. The doll was relevant as corroboration of the victim's testimony that Junkin, who as yet had not been located, was present at the scene of the crime. The judge implicitly found that the doll's probative value outweighed any prejudicial effect. See *Commonwealth* v. *Chretien*, 383 Mass. 123, 134-136 (1981). In any event, given Appleby's lengthy examination of Junkin,[27] Junkin's admission of involvement in the crime, and the relatively innocuous words printed on the doll, any error related to the admission of the doll was harmless beyond a reasonable doubt.

2. Appleby alleges error in the admission of a letter signed by Junkin on the ground that the letter contained references to the Nazi party which were prejudicial to Appleby. Appleby characterizes the letter as "essentially a pledge of allegiance to the Nazi party." The letter was first mentioned at trial by Junkin in response to a question from Appleby. Junkin stated that Appleby had forced him to sign the letter "under the pains of death," that Appleby was

---

[27] Appleby claims that the judge erred when he stopped Appleby's examination of Junkin on the subject of black magic. Appleby, however, did not object to the judge's instruction to him that "[w]e'll have no more of the black arts testimony or voodoo, whatever it is." We will not consider Appleby's claim of error for the first time on appeal. Even if the objection had been timely raised, the judge would have been acting properly to exclude questioning which had no "rational tendency to prove an issue in the case." *Commonwealth* v. *LaCorte*, 373 Mass. 700, 702 (1977). While "[a] criminal defendant may not be prevented from explaining seemingly incriminating evidence offered by the prosecution," *Commonwealth* v. *Hicks*, 375 Mass. 274, 277 (1978), questions concerning either Junkin's knowledge of black magic or his discussions of the topic with Appleby and the victim would not elicit such testimony. Appleby does not claim error in the judge's rulings on the Commonwealth's objections to various questions posed by Appleby to Junkin on this subject. We deem the issues waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). We note that the objections apparently were directed to either the relevancy or form of the questions or to the fact that the questions called for hearsay responses. Appleby made no offers of proof with respect to the excluded questions. The exclusion of these questions did not bar otherwise proper inquiry. See *Commonwealth* v. *Hicks, supra* at 277-278.

supposedly a leader of the Fourth Reich, and that Appleby had told him that he (Junkin) would in time take his "rightful position as the head of the Fourth Reich." Although this answer was not responsive to Appleby's question, Appleby did not move to strike it but instead attempted to cross-examine Junkin on the credibility of Junkin's statement.[28] The Commonwealth later attempted to introduce a copy of the letter as corroboration of Junkin's testimony that he had signed such a letter. The letter was not admitted initially but was later admitted over Appleby's objection, after Appleby had questioned Junkin further on the topic of Naziism. The jury were instructed that the letter was admitted only for the limited purpose of corroborating Junkin's testimony and not for the truth of the matter asserted therein. In light of the fact that the Commonwealth did not, aside from having the letter introduced, mention Naziism, that Appleby attempted to exploit Junkin's statement by cross-examination, and that Appleby was warned that his continued questioning concerning the letter might open the door to its admission, the judge did not abuse his discretion in admitting the evidence. We assume that the jury understood and followed the limiting instructions. *Commonwealth* v. *Jackson,* 388 Mass. 98, 104 (1983), and cases cited.

3. Appleby did not object to the admission of certain handcuffs and shackles which the victim had identified as being those used to bind him, or as being similar to those used to bind him. A State police officer later testified that he had found both items during a search of Appleby's home. On the evidence, the jury could properly infer that the handcuffs and shackles were the ones used by Appleby and

---

[28] Appleby asked, inter alia, the following questions, to all of which the Commonwealth successfully objected: "So, because you were shown a letter with an S.S. death head at the top with double lightning bolts at the top, and you were given supposedly this somewhat unlikely story —"; "You readily believed this somewhat hard-to-digest story, correct?"; "Did any of the discussions about Naziism and international and South America, did any of these discussions about that feed into your already somewhat factious oriented mentality?"

Junkin. See *Commonwealth* v. *Jackson, supra,* and cases cited. There was no error.

4. There was no error in the admission of five photographs taken at Appleby's residence by State police during a search there in June, 1978. Prior to admission, there was a bench conference and voir dire on the photographs during which the judge heard Appleby's objections as to the photographs' relevancy and prejudicial effect. The pictures were relevant to corroborate the testimony of the victim, who was blindfolded during his captivity, as to the layout of Appleby's residence. We note also that Junkin testified that two of the photographs depicted Appleby's residence substantially as it was in October, 1977, with the exception that some of the objects depicted may have been arranged differently, and he also identified two of the pictures as depicting specific items in Appleby's house. The question of prejudice is a matter for the sound discretion of the judge, *Commonwealth* v. *Jackson,* 388 Mass. 98, 103 (1983), and cases cited, and we perceive no abuse of that discretion.

5. Appleby alleges as error the judge's refusal to admit in evidence a will in which Appleby claims he named Junkin as his sole beneficiary. Appleby contends that the will would impeach Junkin's testimony that he had been enslaved by Appleby. Appleby was allowed to testify as to the contents of the will and to the fact that he had discussed the will with Junkin. In these circumstances, any error in refusing to admit the will was harmless beyond a reasonable doubt.

D. *Appleby's Other Contentions.*

We consider Appleby's other contentions, none of which has merit.

1. All the jurors who were seated and who had admittedly heard or seen news reports of this case, of Appleby's earlier case, or of his flight swore either that this information would not affect their judgment or that they knew no reason why they could not judge the case fairly and impartially. The defendant did not exercise all his challenges. There was no error in the denial of the motions for change

of venue or dismissal based on pretrial publicity. See *Commonwealth* v. *Gilday,* 367 Mass. 474, 492 (1975).

2. The judge did not improperly restrict cross-examination of the victim, and Appleby was not deprived of his Sixth Amendment right to confrontation by the judge's evidentiary rulings. While a defendant is allowed to ask questions demonstrating the bias of a witness, we fail to see how the questions propounded by Appleby, directed primarily to the victim's life-style and knowledge of the homosexual community, could have demonstrated bias. There was no error in the judge's refusal to permit further questions on these subjects. As to Appleby's other contentions on this point, we note that the victim repeatedly denied having known Junkin before the incident, testified that he had been taken by force to West Springfield, denied knowing anything about a large sum of money which Appleby claimed had been stolen from him by Junkin and in conspiracy with the victim, and denied having threatened Appleby. The defendant was allowed great latitude on cross-examination of the victim.

3. Appleby has not shown that the judge abused his discretion by not recalling the out-of-State victim, who had already testified for over seven hours on cross-examination. See *Commonwealth* v. *Hicks,* 375 Mass. 274, 276-277 (1978).

4. Appleby attempted to question a former chief of the Springfield police department about a report which Appleby had given him in April, 1978, concerning a recent theft of money from Appleby. At the time of this questioning, there was no evidence that such a theft had occurred, although Appleby referred to a theft in his opening statement to that effect. The judge disallowed the question on the grounds that there was no proper foundation and that the testimony would be hearsay, but he said that Appleby could recall the witness if a proper foundation was later established. At the close of his questioning of this witness, Appleby acknowledged that he could recall the witness but he did not later do so. There was no error in the judge's exclusion of the question.

5. It does not appear from any part of the record to which our attention has been directed that Appleby requested an instruction on assault and battery as a lesser included offense to rape. He did not object to the judge's omission of such an instruction. In these circumstances, we consider the claim of error only in so far as any error might create a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). The victim testified that Appleby forced him to submit to acts of fellatio and sodomy against his will. Appleby repeatedly denied having sexual relations with the victim. Without deciding whether an instruction on assault and battery would have been warranted if requested, a verdict of simple assault and battery on this evidence was not a reasonable possibility. See *Commonwealth* v. *Richmond,* 379 Mass. 557, 563 (1980).

6. Junkin testified that he had reviewed the grand jury minutes prior to surrendering himself and that this review refreshed his recollection of "[t]he basic facts and sequence of events." Junkin claimed an attorney-client privilege as to why and by whom he was given the grand jury minutes, and the judge permitted the claim. There was no offer of proof as to what relevant evidence was shielded from disclosure to the jury by the claim of privilege, see *Commonwealth* v. *O'Brien,* 377 Mass. 772, 775-776 (1979), and we see no ground for mistrial because Junkin had seen the grand jury minutes. See *Commonwealth* v. *Fiore,* 364 Mass. 819, 823 (1974) (grand jury minutes may be used to refresh memory).

7. A Massachusetts State police officer testified that on January 11, 1980, he saw Appleby in Bellingham, Washington. An assistant clerk of the Superior Court in Hampden County testified that on January 7, 1980, a default warrant and capias issued on one of the indictments for which Appleby was then about to stand trial. There was no error in admission of the testimony as evidence of consciousness of guilt. There is no showing that the prejudicial nature of this testimony outweighed its probative value. It was open

to Appleby to rebut this evidence. See *Commonwealth* v. *Toney*, 385 Mass. 575, 582-584 (1982).

8. In response to a question from the assistant district attorney concerning a document, Junkin stated that "[t]his is the document that I signed with a gun at my head by Mr. Appleby." There is no indication that the Commonwealth elicited the statement in bad faith. At the suggestion of Mr. Rutherford, Appleby moved for a mistrial on the ground that the remark concerning the gun was prejudicial. The judge denied the motion and informed Appleby that he might move to strike the comment. Appleby did not move to strike, nor did he request curative instructions. There was no error in the denial of the motion for mistrial. See *Commonwealth* v. *Simmonds*, 386 Mass. 234, 240-242 (1982).

9. Appleby suggests as an issue on appeal the judge's refusal to allow him to inquire into Junkin's "prior sexual conduct, history and background." The issue, however, is nowhere argued in the brief. We deem the issue waived. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). Without commenting on the relevancy of the questions, we note that Appleby was, in any event, allowed to question Junkin extensively on these matters. See generally *Commonwealth* v. *Chretien*, 383 Mass. 123, 136-138 (1981).

10. The judge did not abuse his discretion by refusing to issue subpoenas for certain out-of-State witnesses. See *Commonwealth* v. *Watkins*, 375 Mass. 472, 488 (1978). Appleby did not request subpoenas for these witnesses until after the trial began. Appleby requested and was given the medical records of the surgery on the victim's testicle but he chose not to introduce them at trial. The extent of the victim's injuries was not a material issue and we can see no basis for requiring the testimony of the out-of-State doctors.[29] The judge specifically found that there had been no prima facie showing that the testimony of the other out-

---

[29] However, it appears that the Commonwealth did issue a subpoena for one of the doctors who apparently declined to honor it.

of-State witnesses would be relevant or competent, and Appleby acknowledged that certain in-State witnesses would be able to give testimony similar to that Appleby hoped to elicit from the out-of-State witnesses.

11. The judge did not abuse his discretion by refusing to declare Junkin a hostile witness. See *Commonwealth* v. *Monahan,* 349 Mass. 139, 162-163 (1965). In any event, it is apparent that Appleby was permitted great freedom in the form and substance of his questions to this witness.

The judgments are affirmed, and the Commonwealth's appeal from the allowance of the motion to revise and revoke the sentence on the rape conviction is dismissed.

*So ordered.*