COMMONWEALTH *vs.* RICHARD F. MORAN.

Middlesex.  November 7, 1983. — December 9, 1983.

Present: GRANT, GREANEY, & SMITH, JJ.

*Practice, Criminal,* Assistance of counsel.  *Constitutional Law,* Assistance
   of counsel, Waiver of constitutional rights.  *Waiver.*

A criminal defendant who expressed dissatisfaction with his court-
   appointed attorney failed to establish good cause for the replacement
   of his appointed counsel and, in the absence of any showing of ineffec-
   tive assistance or of an irreconcilable break-down in the attorney-
   client relationship, the judge did not err in requiring him to proceed
   either with his court-appointed attorney as counsel or pro se, with the
   appointed attorney standing by to assist him.  [205-207]
The record in a criminal case supported a finding that the defendant's
   decision to refuse, without good cause, representation by a court-
   appointed attorney, whom the judge found to be competent, consti-
   tuted a voluntary, knowing, and intelligent waiver of his right to
   counsel, where the defendant was aware of the seriousness of the
   charges, the magnitude of his undertaking in representing himself, the
   availability of advisory counsel, and the disadvantages of self-
   representation.  [207-210]

INDICTMENTS found and returned in the Superior Court
Department on March 31, 1981.

The cases were tried before *Garrity*, J.

*Alice A. Hanlon* (*George F. Gormley* with her) for the
defendant.

*Pamela L. Hunt*, Assistant District Attorney, for the
Commonwealth.

GREANEY, J.  In a Superior Court jury trial, the defendant,
Richard F. Moran, was convicted of two counts of armed
robbery, armed assault with intent to murder, and assault
and battery by means of a dangerous weapon.  Moran was
also convicted of a single count of armed burglary.  He was
sentenced to two consecutive life terms for the armed rob-
bery offenses, each to be served concurrently with sentences

of nineteen to twenty years for the armed assault with intent
to murder offenses. He was sentenced to an additional life
term for the armed burglary offense, to be served concurrent-
ly with the second life term for armed robbery. He appeals
from his convictions, asserting that he was forced to proceed
to trial "unrepresented," having refused to go forward pro se
or to permit representation by a court-appointed attorney.
Moran's theories are (1) that counsel assigned to represent
him should have been discharged for cause shown and new
counsel substituted, and (2) that his Sixth Amendment right
to counsel under the United States Constitution was violated
because he did not voluntarily, knowingly, and intelligently
waive his right to counsel, or voluntarily elect to proceed pro
se. We affirm the convictions.

The defendant had originally been represented by an at-
torney with the Massachusetts Defenders Committee. The
case was called in the Superior Court for trial on November
30, 1981. On that date the judge heard certain preliminary
motions, including a motion for a continuance, which was
denied. It was anticipated that empanelment would begin
on the following morning. On the morning of December 1,
1981, however, Moran addressed the court personally and
argued that his counsel be replaced because of a "commu-
nication gap." This "gap" apparently centered on the
defendant's insistence on raising a "temporary insanity"
defense despite a paucity of evidence of insanity.[1] The
judge conducted an extended colloquy in which he probed
the defendant's understanding of the necessity for a legal
basis for a claim of insanity.[2] The judge cautioned Moran

---

[1] The transcript of the December 1, 1981, proceedings indicates that the
defendant wished to present a defense premised on the notion that he
would have had to be insane in order to commit the crimes alleged, since
he had no memory of the incident, was personally acquainted with the
victims, and considered them to be "nice people."

[2] The court had before it examination reports from two psychiatrists
and a psychologist, none of which supported the defendant's theory of in-
sanity. The defendant insisted that because the reports did not say that he
was *not* insane at the time of the crimes his defense was credible and
should be presented to the jury.

that he might have adopted a defense position which no attorney would consider legally supportable. He told Moran, "I do not want . . . to have you say to me, 'Judge, I can't find anyone who is going to accept my position.'" Nonetheless, at the conclusion of the colloquy the judge relieved the public defender, granted a continuance and, later that day, appointed Mr. James O'Donovan to represent Moran.

The case came on for trial before a different Superior Court judge on Friday, January 22, 1982. Moran immediately informed the judge that he did not wish to be represented by Mr. O'Donovan. The judge then conducted a colloquy with the defendant and Mr. O'Donovan. The defendant stated that he was dissatisfied with Mr. O'Donovan because he had not seen the lawyer since he was appointed. The defendant also stated that Mr. O'Donovan had talked to him for less than two hours in total and had not discussed the defense, including whether he should take the stand, and that he did not know what Mr. O'Donovan knew about the case. Mr. O'Donovan, in turn, informed the judge that after his appointment he had acquired the case file compiled by the public defender and had conferred with him about the case. He said that the case was, in his opinion, "fully prepared and ready to go to trial." He explained that he had spoken with the defendant about the case in the courtroom and at the Billerica house of correction on a number of occasions and had unsuccessfully argued a motion for a neurological examination on January 13, 1982, the defendant being present at and participating in the hearing. He indicated that, with the exception of the filing of that motion, he had inherited a case which was ready for trial. He said that he had not returned a call from Moran in early December, 1981, because at the time he did not consider further discussions to be necessary. When he did go to Billerica to see the defendant, on the Sunday previous to the Friday trial date, Moran refused to see him. The subject of the "temporary insanity" defense did not arise in this colloquy.

Having heard both the defendant and Mr. O'Donovan, the judge gave the defendant the choice of proceeding either with Mr. O'Donovan as counsel or pro se, with Mr. O'Donovan standing by as an advisor. The defendant accepted neither option and repeatedly insisted that he would not go to trial with Mr. O'Donovan. A heated exchange ensued. The judge noted for the record his impression that Moran was "seeking to delay these proceedings." The judge then informed the jury venire that the defendant was representing himself (Moran objecting to this characterization) and that Mr. O'Donovan was standing by in case the defendant wished to consult with him. As the judge began to empanel the jury, the defendant refused to remain in the courtroom and was escorted to a holding area where a sound system had been installed at the judge's request to allow the defendant to hear what transpired in the courtroom.

As empanelment proceeded, the defendant was allowed to reenter the courtroom and began to confer with Mr. O'Donovan. After some fifteen minutes of discussion, Mr. O'Donovan informed the judge that the defendant now desired his representation. After fourteen members of the venire were called as jurors, but prior to the exercise of any challenges, Mr. O'Donovan objected to the lack of any black persons either among the fourteen jurors or in the venire from which they came. The judge did not formally rule on the objection but noted that both the defendant and the victims were black. Empanelment thereafter proceeded without incident until the court adjourned for the weekend, a full panel not having been seated.

When court reconvened on the following Monday, January 25, 1982, the defendant presented the judge with a written pro se motion to relieve Mr. O'Donovan and to appoint new counsel. As grounds for the motion, Moran asserted that Mr. O'Donovan had (1) refused to file motions; (2) interfered with attempts to obtain "necessary records" by insisting that he file pro se motions to obtain them; (3) refused to talk to him; (4) expressed personal dislike for him; and (5)

expressed an opinion that he was guilty. The motion also asserted, as a sixth ground, that there was a "conflict of interest between counsel and defendant." Inquiring of Mr. O'Donovan, the judge determined that he had met with the defendant for four to five hours over the weekend. Mr. O'Donovan also informed the judge that he had spoken to the defendant about the advisability of a plea of guilty but that the defendant had not accepted his advice. The judge treated the motion as a restatement of the defendant's pre-empanelment protestations, "already denied." The trial proceeded with the defendant representing himself "[u]nder protest . . . because I have no other choice." Mr. O'Donovan remained available in the courtroom throughout the trial in the event that the defendant wished to seek his advice or have him act as his counsel. It appears from the transcript that the defendant spent a large portion of the trial in self-imposed exile outside the courtroom, listening to the proceedings on a speaker system and taking little active part. Mr. O'Donovan took no active part in the trial.

1. The constitutional right to counsel in a criminal case does not guarantee a defendant the right to any particular court-appointed counsel. *Commonwealth* v. *Moran,* 388 Mass. 655, 659 (1983), and cases cited. "A court need not tolerate unwarranted delays, and may at some point require the defendant to go to trial even if he is not entirely satisfied with his attorney." *Maynard* v. *Meachum,* 545 F.2d 273, 278 (1st Cir. 1976). Whether a motion for substitution of counsel should be allowed depends on the defendant's demonstrating good cause. Some examples of good cause include counsel's incompetence or failure to prepare a defense, conflict of interest, or a complete breakdown in communication which threatens the defendant's right to a fair trial. See *Lofton* v. *Procunier,* 487 F.2d 434, 436 (9th Cir. 1973); *McKee* v. *Harris,* 649 F.2d 927, 931 (2d Cir. 1981), cert. denied, 456 U.S. 917 (1982). The final decision on a motion to change counsel is committed to the trial judge's sound discretion, which is to be exercised only after the defendant has been given an adequate opportunity to state his

grounds for seeking discharge of counsel. *Lamoureux* v. *Commonwealth,* 353 Mass. 556, 560 (1968). *Commonwealth* v. *Moran, supra* at 659. If the motion for substitution is properly denied, the defendant may then permissibly be confronted with the choice of continuing his representation by appointed counsel or acting pro se. If the defendant chooses (or is left with) the latter situation, the final inquiry must be whether the defendant's "decision was understandingly and intelligently made: that is, did he make this choice 'with eyes-open.'" *Maynard* v. *Meachum, supra* at 279, quoting from *Adams* v. *United States ex rel. McCann,* 317 U.S. 269, 279 (1942).

2. With these principles in mind, we turn to the first relevant question: whether the defendant established good cause for the discharge of Mr. O'Donovan and the appointment of new counsel.

The sum total of the defendant's complaints in connection with his attempt to replace Mr. O'Donovan on Friday morning, January 22, 1982, was that there had been inadequate communication between attorney and client concerning the conduct of the defense. The judge conducted a colloquy with the defendant and Mr. O'Donovan, as prescribed by *Commonwealth* v. *Moran, supra* at 659. The judge also had before him a transcript of the proceedings on November 30, 1981, which led to the substitution of Mr. O'Donovan for the defendant's original counsel. Mr. O'Donovan revealed precisely what contacts had been made between himself and Moran and stated his conclusion that the case was ready for trial. The defendant articulated no reason which would justify removing Mr. O'Donovan. Based on the information before him, the judge acted well within the bounds of sound discretion when he denied the motion after giving the defendant ample opportunity to present his reasons for wishing to have Mr. O'Donovan discharged.

The defendant's new motion on Monday morning, January 25, 1982, raised grounds which differed from the "lack of communication" ground argued on the previous Friday. The judge conducted a more limited inquiry, which disclosed that

attorney and client had talked for four or five hours over the weekend, that Mr. O'Donovan had advised the defendant to enter a plea of guilty, and that the defendant had rejected that recommendation. After the inquiry, the judge treated the motion as "already denied," based on the information before him, including Friday's colloquy.

The first two grounds in support of the new motion (alleging failures by Mr. O'Donovan to file motions and to obtain "necessary records") lacked specificity and amounted to no more than a disagreement over trial tactics. The judge could have found that these reasons did not provide a basis for assigning new counsel. See *United States* v. *Todisco,* 667 F.2d 255, 261 (2d Cir. 1981), cert. denied, 455 U.S. 906 (1982).

The third ground (an alleged refusal of counsel to talk to Moran) simply repeated the contentions first made on Friday. The judge could have determined from the colloquies on Friday and Monday that there had been substantial communication between attorney and client over the weekend, and that whatever difficulty there might have been in communication stemmed from the defendant's intransigence. The judge could have properly concluded that the defendant could not create his own communication gap by stubbornly refusing to talk to his lawyer.

The fourth, fifth, and sixth grounds of the motion concerned Mr. O'Donovan's alleged dislike for Moran, counsel's opinion that the defendant should plead guilty, and an alleged "conflict of interest between counsel and defendant." These three grounds may be considered together. There is nothing in the record indicating the existence of any true conflict of interest which would call for Mr. O'Donovan's disqualification. For all that appears, the conflict alluded to by Moran was personal in nature and related (together with the two other grounds) to the rapport between client and attorney. That relationship was undoubtedly strained by counsel's advice that the defendant should consider a plea of guilty but that factor alone is not enough to require a substitution of counsel. In the absence

of any showing of ineffective assistance or of an irreconcilable breakdown in the attorney-client relationship, the defendant cannot turn a perceived lack of a meaningful relationship into a ground for discharging his lawyer. See *Morris* v. *Slappy*, 461 U.S. 1, 10-11 (1983); *Commonwealth* v. *Miskel*, 364 Mass. 783, 790 (1974). See also *Brown* v. *United States*, 264 F.2d 363, 366 (D.C. Cir.), cert. denied, 360 U.S. 911 (1959); *McKee* v. *Harris*, 649 F.2d at 931-932; *United States* v. *Todisco*, 667 F.2d at 261. We conclude that the judge properly rejected Moran's second motion as a manipulative eleventh hour attempt to obstruct the orderly disposition of the case.[3] We also conclude that the proffered choice of proceeding pro se or with Mr. O'Donovan was not, at this juncture, constitutionally offensive. See *McKee* v. *Harris, supra* at 931.

3. We turn to the final question: whether the defendant's decision to refuse Mr. O'Donovan's representation (in essence forcing Moran to proceed pro se) constituted a voluntary, knowing, and intelligent waiver of his Sixth Amendment right to counsel.[4]

As has been seen, the defendant's objections to proceeding with his appointed counsel were insufficient to require the appointment of a new lawyer, and Mr. O'Donovan was implicitly found to be prepared and competent to represent the defendant at trial. This aspect of the waiver test is therefore governed by the settled rule that "a [defendant's] refusal without good cause to proceed with able appointed counsel is

---

[3] The defendant spends most of his brief attempting to analogize the case to the predicament faced by the defendant in *Commonwealth* v. *Cavanaugh*, 371 Mass. 46 (1976). There is no valid basis for comparison. Moran was not presented with a "Hobson's choice" of acting pro se or going forward with incompetent or unprepared counsel. *Id.* at 53-54. Nothing was shown to warrant a conclusion that appointed counsel's representation suffered from a lack of preparation or that it would have been incompetent.

[4] The fact that Moran was not asked to sign a written waiver of counsel, see Mass.R.Crim.P. 8(e), 378 Mass. 858 (1979), "is not conclusive of a lack of waiver." *Commonwealth* v. *Appleby*, 389 Mass. 359, 368 (1983). It is quite apparent, based upon Moran's intransigence throughout the trial, that had he been asked to sign a waiver, he would have refused.

a 'voluntary' waiver" of the right to counsel. *Commonwealth* v. *Appleby*, 389 Mass. 359, 366-367 (1983), quoting from *Maynard* v. *Meachum*, 545 F.2d at 278.

The criteria for deciding whether the waiver was also knowing and intelligent were synopsized by Chief Judge Coffin in the *Maynard* decision (545 F.2d at 279) in these terms: "[T]here is no particular piece of information that is essential to an effective waiver of counsel. An intelligent waiver does not require that the accused have the skill or knowledge of a lawyer. What is required, we think, is a sense of the magnitude of the undertaking and the 'disadvantages of self-representation,' an awareness that there are technical rules governing the conduct of a trial, and that presenting a defense is not a simple matter of telling one's story. In addition, the accused should have a general appreciation of the seriousness of the charge and of the penalties he may be exposed to before deciding to take a chance on his own skill." (Citations omitted.) See *Commonwealth* v. *Appleby*, 389 Mass. at 368. The *Maynard* case goes on to point out that the defendant's knowledge and understanding of these facts need not affirmatively appear on the record[5] but may be gleaned from all the circumstances of the case. "The [trial] court may properly consider, in addition to [the defendant's] background, experience and conduct . . . such factors as his involvement in previous criminal trials, his representation by counsel before trial, and the continued presence of advisory counsel at trial in determining whether he understood what he was getting into." 545 F.2d at 278.

The defendant appears from the record to possess reasonable intelligence and to be "literate, competent, and under-

---

[5] It would undoubtedly be helpful if the fact of an understanding and intelligent waiver did so appear. A colloquy between judge and defendant by which the defendant is warned of the difficulties involved in rejecting the assistance of counsel would be a useful procedure to nail the point down. In some cases, a defendant may be so disruptive that a colloquy would be excused. Despite Moran's attempt to impede the trial, the Commonwealth does not contend that his conduct was so aggravated that inquiry about his understanding of his situation should be deemed waived.

standing." *Faretta* v. *California*, 422 U.S. 806, 835 (1975). The judge saw him and had the opportunity to appraise his capacity to understand, remarking at one point during jury selection that the defendant "totally and completely understood what was going on." The defendant also appears to be somewhat conversant with court procedures, as demonstrated by his ability to prepare and argue reasonably detailed motions. His attempt to raise a "temporary insanity" defense also demonstrates his awareness of legal defenses and the Commonwealth's need to prove criminal responsibility. He was undoubtedly aware of the considerable strength of the Commonwealth's case against him[6] and knew, or should have known, from the courtroom hearings on his motions that any possible claim of lack of criminal responsibility would be unavailing. No other facts supporting a claim of innocence have been suggested. Moran's second motion disclosed his knowledge that "he could be sentenced to life in prison" if convicted. His considerable involvement with two lawyers, including a lengthy weekend conversation with Mr. O'Donovan after the commencement of trial, suggests that counsel had discussed all relevant aspects of the case with him, including, from the recommendation of a guilty plea, the fact that defense of the case would be very difficult. We also note that Mr. O'Donovan remained as standby counsel throughout the trial and was once summoned into service by the defendant

---

[6] The evidence in the Commonwealth's case would have permitted the jury to find the following. About 10:45 P.M. on February 16, 1981, Moran was seen entering the home of the two victims, a daughter and her seventy-nine year old father. Moran was known to both victims. After gaining entrance to the house Moran robbed the daughter of her diamond ring and $10, and the father of the proceeds of his pension check. Moran thereafter repeatedly stabbed both victims, at one point telling the father "Old man, you should die!" Moran was arrested shortly thereafter by the Medford police, wearing a blood stained jacket and possessing the items taken from the victims' home. The daughter identified Moran at the hospital. A fingerprint expert identified a fingerprint on a glass containing a drink given to the assailant as belonging to Moran. A State police chemist identified the daughter's nightgown and robe, as well as Moran's jacket and knife as all containing type-O human blood.

during jury selection. To buttress further the conclusion that the defendant did not go through the trial uninformed, we have the judge's scrupulous efforts to advise him of the rules of trial procedure and to ensure that he received a fair trial.[7] After a review of the entire record, we conclude that Moran knowingly and intelligently waived his right to counsel because he "was adequately aware of the seriousness of the charges, the magnitude of his undertaking, the availability of advisory counsel, and the disadvantages of self-representation." *Commonwealth* v. *Jackson*, 376 Mass. 790, 795 (1978).

*Judgments affirmed.*

---

[7] The judge did the following: (a) precharged the jury on the Commonwealth's burden of proof and advised them that the fact that the defendant was representing himself should not be held against him; (b) explained to the defendant his right to make an opening and the procedure by which witnesses can be examined and cross-examined; (c) had all exhibits brought to the adjoining room and shown to the defendant; (d) granted a recess after the daughter's testimony to furnish the defendant an opportunity to prepare his cross-examination; (e) asked the defendant after each witness testified whether he wished to return to the courtroom either to engage in cross-examination, or to consult with Mr. O'Donovan; (f) excluded hearsay testimony on his own initiative; (g) sanitized the defendant's fingerprint card and the hospital records before the exhibits were admitted in evidence; (h) suggested different approaches to the defendant with respect to presenting a defense (i.e. call witnesses, his privilege against self-incrimination, etc.); (i) advised the defendant about the role of closing arguments and the procedure for challenging the final jury instructions; and (j) forcefully instructed the jury not to draw any inference from the defendant's conduct during the trial and to focus solely on whether the Commonwealth had proved each charge against the defendant beyond a reasonable doubt.