COMMONWEALTH vs. JAMES H. SOWERS, JR.

Suffolk. October 6, 1982. — February 17, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Practice, Criminal,* Examination of jurors. *Identification. Evidence,* Expert opinion.

At the trial of a black defendant on indictments charging unnatural rape of a white woman and other serious crimes, the judge's statement to the group of prospective jurors respecting the nature of the charges and the races of the defendant and the victim, followed by his inquiry of each prospective juror whether the race of a witness would affect the juror's view of the witness's credibility, fulfilled the judge's duty under G. L. c. 234, § 28. [210-213]

At the trial of a black defendant on indictments charging unnatural rape of a white woman and other serious crimes, where the record did not support a claim that the defendant was a special target for racial prejudice, the judge was not required to inquire of jurors concerning their attitude toward interracial unnatural rape; nor did his initially making such an inquiry and later discontinuing it in examinations of prospective jurors violate the defendant's rights under G. L. c. 234, § 28, or under the State or Federal Constitutions. [213-214]

Testimony by an ophthalmologist as an expert witness at a criminal trial, in which he referred to the ability of the victim, who suffered from severely impaired vision, to "identify" a person and to "pick out a photograph," did not go beyond the witness's area of expertise or infringe on the province of the jury where the context made clear that this testimony related only to the victim's visual acuity, and where the judge correctly instructed the jury as to their duties in evaluating identification testimony. [214-218]

INDICTMENTS found and returned in the Superior Court Department on August 15, 1979.

The cases were tried before O'Neil, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Patricia A. O'Neill* for the defendant.

*David B. Mark,* Assistant District Attorney, for the Commonwealth.

NOLAN, J.  The defendant, a black man, was indicted by a Suffolk County grand jury on August 15, 1979, on two charges of unnatural rape and one charge each of kidnapping, armed robbery, assault and battery by means of a dangerous weapon, and assault and battery.  The defendant's first trial ended in a mistrial on March 21, 1980, when the jurors were unable to agree on a verdict.  The defendant's second trial began on June 3, 1980, and, on June 5, the jury found him guilty as charged on each indictment.  He was sentenced to State prison for concurrent terms of not less than six nor more than ten years for all but the two assault and battery convictions, which were placed on file.[1]  The defendant appealed on two grounds:  (1) that the judge's questions to prospective jurors at voir dire did not sufficiently probe the possibility of racial bias, and (2) that the judge improperly admitted the opinion testimony of an ophthalmologist concerning the victim's ability to "identify" people under certain conditions.  The Appeals Court affirmed the convictions.  *Commonwealth* v. *Sowers,* 13 Mass. App. Ct. 975 (1982).  We granted the defendant's application for further appellate review.  We find no error and affirm the convictions.

We summarize the facts.  Other facts necessary to understand the issues raised appear elsewhere in this opinion.  The victim is a white female albino who is "legally blind" (twenty/two hundred vision).  She was attacked on a Brighton street shortly after midnight on July 15, 1979.  Her assailant asked her for money and threatened to kill her if she screamed.  He then dragged her into a nearby alley and beat her when she started to struggle, again threatening to kill her.  The assailant then held a knife to the victim's throat and forced her to a third-floor room of a burned-out

---

[1] Since the defendant consented to placing these indictments on file, there is no appeal on these convictions properly before us.  *Commonwealth* v. *Delgado,* 367 Mass. 432, 437-438 (1975).

building beside the alley. He pushed the victim into a corner and ordered her to remove her clothes. When she had done so, he compelled her to submit to acts of fellatio and sodomy. He then went through the victim's pocketbook and took her wristwatch from her wrist. He left after telling the victim he would return to kill her if she made any noise.

The victim was with her assailant for about one-half hour, during which time she studied his face so as to be able to identify him. The room in which the rape took place was illuminated by a street light shining through the windows. The victim waited a few minutes, then dressed and screamed for help. A woman living nearby heard the victim and went to her aid. When the police arrived a few minutes later, the victim, crying and very upset, described the assailant as a thin, bemoustached black man, maybe seventeen to twenty years old, "a little taller" than her own height of about five feet three inches, and weighing approximately one hundred ten to one hundred twenty pounds. The height, weight, and age were based on comparisons with the victim's own height, weight, and age. She described the assailant as wearing a dark blue shirt with a white circle and printing on the front, brown pants, and a beige "fisherman's cap" with a narrow dark band around the edge. The victim was then taken to a hospital.

The next morning, a police officer accompanied the victim to the scene. He then took her to the police station in Brighton, where he interviewed her and gave her books of photographs to view. After looking through three or four books, the victim selected a picture of the defendant as the man who attacked her. The picture was four years old and it depicted the defendant as clean shaven. The defendant was arrested the next day, July 16, and a photograph taken at the time of arrest shows the defendant as having a moustache and goatee.

That evening the victim was informed that the man whose photograph she had selected had been arrested. On the morning of July 17, she went to the Brighton Division of

the District Court Department and met a police detective who told her to wait in the courtroom. The victim walked to the front of the courtroom where she saw two men in a cell. When she was within four or five feet of the cell, she recognized one of the men, the defendant, as her assailant. The victim also identified the defendant at trial. According to police records, the defendant was five feet, eight inches tall and weighed 135 pounds.

At trial, the defendant's mother, sister and girl friend, all of whom lived with the defendant in Brighton, testified that they were with the defendant at home either part or all of the time on the evening of the attack. Another friend testified that she had spoken with the defendant by telephone at his home for some time on that evening. The defendant's mother testified that the defendant did not own clothing such as that described by the victim. His sister and girl friend stated they had never seen him wearing such clothes. The defendant's sister also testified that the scene of the attack was about a five minute walk from their apartment.

1. *The Questioning of Prospective Jurors on Racial Prejudice.*

Prior to the second trial, the defendant moved under G. L. c. 234, § 28,[2] that the members of the venire be ques-

---

[2] General Laws c. 234, § 28, as amended through St. 1975, c. 335, provides: "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead.

"For the purpose of determining whether a juror stands indifferent in the case, if.it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations,

tioned "individually and out of the hearing of other prospective jurors."[3] Included in the questions proposed by the defendant were two questions dealing with racial prejudice.[4] The motion was "allowed to the extent of generalizing most questions." Although there is no transcript available for the proceedings on the first day of jury empanelment,[5] it is apparent from the judge's later remarks that, on the first day, he had informed the assembled venire at least generally as to the nature of the charges and the races of the defendant and the victim, and that he had asked the members of the venire to make known "any reason that they felt that they could not stand indifferent." It is also apparent, and undisputed, that on both days the judge asked each juror individually a question designed to discover whether the race of a witness

---

attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination may include a brief statement of the facts of the case, to the extent the facts are appropriate and relevant to the issue of such examination, and shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

[3] The defendant had made a similar motion at his first trial.

[4] The questions were as follows:

"[1.] This case may also involve weighing the credibility of white witnesses against the credibility of black witnesses.

"a. Do you have any feelings about blacks or whites that might affect your judgment in this case?

"b. Do you feel that you would be more likely to believe the testimony of a white witness than the testimony of a black witness, or vice versa?

"c. Do you feel that black persons are more prone to commit crimes than white persons?

"[2.] This case involves the allegation of rape of a white woman by a black man.

"a. Does the nature of the charge interfere with your ability to judge the facts impartially?

"b. Do you feel that black men are more inclined to commit this type of crime than white men?"

[5] The stenographer lost his notes for the first day of the empanelment. Based on defense counsel's notes for that day, the Commonwealth and defense counsel entered into a stipulation concerning which of the prospective jurors were seated and which were challenged by the prosecution and the defense.

would affect the prospective juror's view of the witness's credibility (the credibility question).[6] The judge also asked each female prospective juror a question probing the effect of the fact that the case involved the unnatural rape of a white woman by a black man (the sensitivity question).[7] The judge had asked this question of all or most of the prospective male jurors on the first day but he did not, over the defendant's objection, continue this practice on the second day.

The defendant contends that the judge's refusal to examine all prospective male jurors "about their attitudes towards interracial unnatural rape was 'an unconstitutional abuse of discretion', *Rosales-Lopez* v. *United States*, [451 U.S. 182, 190 (1981),] and a violation of his 'heavy responsibility' under G. L. c. 234, § 28." As a result of this abuse of discretion, the defendant's argument continues, the judge was unable to fulfil his duty to discharge jurors for cause, the defendant was unable to exercise intelligently his peremptory challenges against male jurors, and at least three males who had not been asked the sensitivity question participated in the jury's deliberations. The defendant contends that this

[6] This question was in substantially the following form: "[Y]ou probably will find that most of the witnesses to be called by the Commonwealth will be white witnesses, and most of the witnesses that will be called on behalf of the defendant will be black witnesses. Do you feel that you would have any tendency subconsciously to favor the testimony of white over black or black over white, or would you be able to judge them in a way completely apart from the color of their skin." At the prosecutor's suggestion on the second day of empanelment, the judge changed the question so as not to associate either the Commonwealth or the defense with witnesses of a particular race.

[7] This question was substantially as follows: "You perhaps notice from what I said yesterday before all of you while you were here that two of the indictments in this case, two of the matters that are going to be determined by jurors involve claims that a white woman was raped unnaturally by a black man. Now, if you feel that the type of evidence that might come in a case like this would be so unpleasant and distasteful to you that you would want to ask to be relieved from any obligation to sit as a juror in a case, I'd like you to tell me. I'd like you to understand, as I know you do, that the Commonwealth has a right to have this case heard before a jury [of] citizens of Suffolk County, and the defendant has the right to have this case heard before a jury of citizens of Suffolk County. Do you feel that you would want to ask me not to require you to sit on this case?"

constitutes a violation of his rights under G. L. c. 234, § 28, and his rights to a fair trial and due process as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We do not agree.

There is no support in the record for a claim that this defendant was a "special target for racial prejudice." *Commonwealth* v. *Ross*, 363 Mass. 665, 672, cert. denied, 414 U.S. 1080 (1973) (with dissents), habeas corpus granted sub nom. *Ross* v. *Ristaino*, 388 F. Supp. 99 (D. Mass.), aff'd, 508 F.2d 754 (1st Cir. 1974), rev'd, 424 U.S. 589 (1976). See *Ham* v. *South Carolina*, 409 U.S. 524 (1973). The case of *Rosales-Lopez* v. *United States*, 451 U.S. 182 (1981), does not eliminate the requirement that a person claiming Federal constitutional error based on the voir dire of prospective jurors must show "special circumstances,"[8] *Ross, supra.* Further, even in cases where the defendant is a special target, the trial judge is not required "to put the question in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so" by the defendant. *Ham, supra* at 527.

We believe that the credibility question, combined with the judge's comments on the nature of the offense and the races of the defendant and the victim, was sufficient to satisfy his obligation under G. L. c. 234, § 28. The instant case is similar to *Commonwealth* v. *Core*,[9] 370 Mass. 369 (1976). In that case, we upheld a voir dire where "the judge called to the attention of the prospective jurors the facts that the defendants were black and that the alleged victim was white, and inquired of them collectively whether

---

[8] In *Rosales-Lopez* v. *United States*, 451 U.S. 182, 192 (1981), the Supreme Court said "that federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups." That rule, however, is based on the Supreme Court's supervisory power over lower Federal courts. *Id.*

[9] The *Core* case was tried prior to the enactment of St. 1975, c. 335, which amended G. L. c. 234, § 28.

this raised any bias or prejudice in their minds which would prevent them from deciding the case fairly and impartially on the evidence and without regard to the color of either the defendants or the victim." *Id.* at 373. Since we conclude that the judge was not required to ask each potential juror the sensitivity question, his failure to ask three male jurors the sensitivity question is not reversible error.

Another short but conclusive answer is found in *Commonwealth v. Sanders*, 383 Mass. 637, 640-641 (1981), where we ruled that in cases tried after that decision it would be "a matter of law [that] interracial rape cases present a substantial risk that extraneous issues will influence the jury and hence are within § 28, second par." This holding was based "not on a constitutional mandate, but on the need for caution and certainty in the application of § 28." *Commonwealth v. Hobbs*, 385 Mass. 863, 873 (1982). Since the present case was tried in 1980, the defendant does not benefit from our ruling in *Sanders*.

2. *The Admission of the Ophthalmologist's Opinion.*

At trial, Dr. Edward B. Murphy, Jr., was qualified as an expert in ophthalmology with a specialty in the field of albinism. On direct examination, Dr. Murphy testified as follows: The victim, whom he had seen as a patient on three occasions, was an albino and legally blind; albinism produces precise and predictable visual disturbances; the victim's vision, with corrective lenses, was twenty/two hundred, meaning that she could see at twenty feet what a person with normal vision could see at two hundred. The victim suffers from astigmatism, which causes distortion in perception, and from nystagmus, which is a gentle rocking of the eyes resulting in a blurred effect similar to that produced in a picture taken by a camera in motion. The victim is used to the effects of these diseases, and daytime glare affects her vision in such fashion that she sees better at night. Direct examination of Dr. Murphy concluded with the following questions and answers, to which defense counsel objected: THE PROSECUTOR: "And, Doctor, if [the victim] were looking at a person from this distance, or from this

distance, would she be able to identify that person?" THE WITNESS: "Yes." THE PROSECUTOR: "And if she were looking at a book of photographs, would she be able to pick out a photograph?" THE WITNESS: "Yes."

The defendant challenges admission of this testimony on the grounds that it was beyond the scope of the doctor's area of expertise, based on scientific principles as yet unaccepted as a proper basis for expert testimony, and unnecessary to the jury's determination whether the victim's identification was reliable. In light of the fact that the victim's identification of the defendant was uncorroborated from any other source, and subject to many of the weaknesses making eyewitness identification unreliable, the danger is that the jury may have relied on the apparent trustworthiness of this opinion to erase otherwise reasonable doubts in their minds. We are aware that such a possibility exists. In *Commonwealth* v. *Gardner*, 350 Mass. 664 (1966), we affirmed a conviction for unnatural and lascivious acts, but reversed the defendant's rape conviction because we believed that the testimony of a gynecologist, admitted as expert opinion, that he "thought that there was forcible entry" was based on "factors outside the area of his professional competence" and "could have substantially influenced the jury's decision as to whom to believe." *Id.* at 666-667. However, we think there is no such danger in the present case. The Commonwealth contends, and we agree, that it is clear from the record that the word "identify," as used in the passage quoted above, was meant, and could only be understood by the jury, to refer to the victim's visual capability to distinguish the features of a person whom she viewed at a certain distance rather than to her ability to perform the complex tasks of human perception necessary to make an identification of an individual as a person whom one has seen earlier.

The prosecutor's questions on direct examination were all aimed at determining the victim's visual acuity and the effects that the various diseases she suffered from had on her vision. These were matters well within the doctor's field of

knowledge and also matters concerning which, given the nature and variety of the victim's visual disabilities, the jury were not equally capable of drawing conclusions. Compare *Commonwealth* v. *Gardner, supra; Lawlor* v. *Wolff,* 180 Mass. 448 (1902) (doctor not allowed to testify whether it was possible for a man to have carnal knowledge of a woman of relatively the same strength against her will); *Commonwealth* v. *Middleton,* 6 Mass. App. Ct. 902 (1978) (upholding trial judge's ruling that testimony of expert on human memory as to factors affecting the reliability of eyewitness identification was inadmissible as not beyond the scope of the average juror's knowledge and experience). The prosecutor asked no questions concerning the victim's ability to retain or recall what she had seen. He apparently emphasized the point of the challenged questions by moving various distances from the witness as he spoke. On cross-examination, defense counsel used the word "identification" in his effort to impeach the doctor's testimony, and his questions implicitly recognize that the only issue raised by the doctor's previous testimony was whether the victim had the visual ability to make out the features of her assailant during the attack.[10] After further questioning on redirect examina-

---

[10] The questions and answers on this point were as follows:

DEFENSE COUNSEL: "Now, you have indicated that [the victim] would be able to make an identification of a person who was close to her, is that right?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "Your response to the District Attorney's question: he stood in front of you a matter of a couple of feet, and you said that a matter of a couple of feet, and you offer the opinion that [the victim] could make an identification, is that correct?"

THE WITNESS: "That's right."

DEFENSE COUNSEL: "That opinion, is it not, is based upon optimum full lighting circumstances because, clearly, if a light were shining in her eye at that distance she would be less able to make such identification?"

THE WITNESS: "If a light of enough intensity were shining in her eyes, obviously the intensity dims the further from [the victim] is the light."

DEFENSE COUNSEL: "Yes. I understand that, but your opinion is based, if you will, upon good circumstances, lighting circumstances as opposed to bad lighting circumstances, and the worse lighting circumstances the less able they would be to make such a case?"

THE WITNESS: "Not necessarily so, no."

tion, the judge also questioned the doctor, and it appears from the judge's question and the witness's answer that the clarity and distinctness of the victim's vision were the only matters in issue.[11]

In his closing, the prosecutor again referred to the doctor's testimony concerning the victim's ability to make an "identification," and the context once again indicates that the term was meant to refer only to the victim's ability to see despite her eye problems.[12]

Finally, we note that the judge gave a lengthy and correct instruction to the jury on identification testimony, which

---

[11] The following exchange took place among the prosecutor, the witness, and the judge:

THE PROSECUTOR: "In answer to a question that I asked you and [defense counsel], he again went over and relative to her identifying a person she did see at this distance and again at this distance, [defense counsel] asked you whether that glare could prevent her. Now, if I were to tell you, Doctor, that she saw this person for approximately thirty minutes moving about and around, would you then say that glare could not possibly be there at all times?"

THE WITNESS: "I would say that under any lighting circumstances she could recognize this individual."

THE PROSECUTOR: "Thank you, Doctor."

THE JUDGE: "And by that you really mean that she could recognize a person two feet away from her, in effect, with the same clarity or distinctness that a person with normal eyesight could see at twenty feet?"

THE WITNESS: "Exactly."

[12] The prosecutor summarized Dr. Murphy's testimony as follows: "Now, we brought in Dr. Edward Murphy. I think we can all agree that his testimony was clear, concise, and right to the point. What did he tell us? First of all, what is he? He is a doctor, eye doctor. What specialty does he have? He is an eye doctor who deals with people who are albinos and their particular vision problems. 'Doctor, can she see better at night? Absolutely. Doctor, if I were standing in front of her, here or here for approximately a half an hour, could she make an identification of me under those circumstances? Absolutely.' That is not something that I said or that [the victim] said. That is a doctor who is a specialist in this kind of eye problem. I think you have to think long and hard about his testimony. He is a specialist. He was asked clearly: could she make an identification? Could she pick out a picture? Absolutely. His answers were always in the affirmative to those questions. He told you what her problems were, what her liabilities were as far as her vision and what she could do with her vision. He told you about the eye chart and how those of us with 20/20 would stand at a twenty foot pace and read the bottom line, and if she were standing right here or sitting right there, she could read that line also."

emphasized the fact that an "identification" in the legal sense could take place only after a victim had opportunity to see and observe the person whom she later identified. The judge also pointed out the pertinent factors which might have affected this victim's opportunity to observe and told the jury it was "absolutely critical" that they determine whether the victim had adequate opportunity to observe her assailant. He had earlier instructed the jury that they could accept or reject the expert testimony and that an expert was no more or less believable than any other witness.

In these circumstances we think it unlikely that the jurors understood Dr. Murphy's testimony to be anything other than expert medical opinion as to the victim's visual capabilities. As such, its admission was not improper.

In all, we find no reversible error.

*Judgments of the Superior*
*Court affirmed.*