COMMONWEALTH *vs.* ALLEN YOUNG.

Suffolk.  September 8, 1987. — December 30, 1987.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & LYNCH, JJ.

*Jury and Jurors. Practice, Criminal,* Examination of jurors, Challenge to jurors, Required finding, Deliberation of jury, Capital case. *Evidence,* Hearsay, Spontaneous utterance. *Homicide. Felony-Murder Rule.*

Although interrogation of jurors as to racial prejudice is not constitutionally mandated in cases involving interracial murder unless the defendant is a "special target" for racial prejudice, this court announced that in such cases tried hereafter jurors are to be examined individually with respect to racial prejudice pursuant to G. L. c. 234, § 28, second par., if such examination is requested by the defendant. [395-398]

At a murder trial in which the defendant and the victim were members of different racial groups, the judge did not err in denying defendant's motion for individual voir dire of jurors with respect to racial prejudice on the basis of his State and Federal constitutional right to be tried by an impartial jury, where nothing in the record indicated that the defendant was a special target of racial bias, and the subject of racial prejudice was not at issue in the trial. [399-400]

At the trial of an indictment charging the defendant, a black man, with the first degree murder of a person of Hispanic origin, the judge's denial of the defendant's motion for a hearing on the prosecutor's use of peremptory challenges to exclude black persons from the jury violated neither art. 12 of the Massachusetts Declaration of Rights nor the equal protection clause of the Fourteenth Amendment to the Federal Constitution, where both the prosecutor's explanation for challenging three out of the seven blacks eligible to be seated and certain comments of the judge supported the conclusion that the prosecutor had not improperly excluded blacks from the jury. [400-402]

The judge at a murder trial did not abuse her discretion in admitting in evidence under an exception to the hearsay rule a spontaneous utterance by a person at the scene of the crime where the statement, which related to the crime, was made within seconds of the incident by a person who observed what had happened. [402-403]

At a murder trial, certain hearsay statements elicited from a witness during the prosecution's case-in-chief, to which no objection was made, were cumulative of other evidence and their admission created no likelihood of a miscarriage of justice. [403-404]

At a murder trial, evidence that the defendant killed the victim in the course of an attempted armed robbery warranted a finding that the defendant was guilty of murder in the first degree on the theory of felony-murder. [404-405]

The judge at a murder trial did not abuse her discretion in deciding to retain a certain juror who, during the jury's deliberations, had expressed reluctance to continue serving, where the judge, after a lobby conference attended by the attorneys and the juror, had determined under G. L. c. 234, § 26B, that there had been no showing of "good cause" for the juror's discharge. [405-406]

INDICTMENT found and returned in the Superior Court Department on May 23, 1984.

The case was tried before *Sandra L. Hamlin, J.*

*Willie J. Davis* for the defendant.

*Paul Connolly,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. On May 23, 1984, a Suffolk County grand jury indicted the defendant, Allen Young, a black man, for the murder in the first degree of Angel Luis Ortiz, a person of Hispanic origin. Prior to trial, the defendant filed a motion for the individual voir dire of the venire. The trial judge, after hearing argument, denied the motion. Later, during the course of the jury selection process, the defendant made two motions challenging the prosecutor's use of peremptory challenges. The motions were denied. The trial commenced on March 20, 1985. On April 5, 1985, the jury found the defendant guilty of murder in the first degree on the theory of deliberately premeditated malice aforethought and also on the theory of felony-murder.

In this appeal, the defendant argues that (1) the judge's denial of his motion for individual voir dire violated G. L. c. 234, § 28, and the defendant's State and Federal constitutional right to be tried by an impartial jury, (2) the judge's denial of the defendant's motion for a hearing on the prosecutor's use of peremptory challenges to exclude black persons from the jury violated his State and Federal constitutional rights, (3) the judge's admission in evidence of hearsay statements violated the defendant's State and Federal constitutional rights to confront the witnesses against him, (4) the evidence

was insufficient as matter of law to prove beyond a reasonable doubt that the defendant committed murder in the first degree under either the theory of felony-murder or of deliberately premeditated malice aforethought,[1] (5) the judge's failure to discharge a deliberating juror and to declare a mistrial violated the defendant's constitutional right to a trial before an impartial jury, and (6) a miscarriage of justice would occur if the verdict of guilty were allowed to stand.

We summarize the evidence put before the jury. On the evening of November 25, 1983, the defendant went to the home of a friend, Rick Johnson, and watched a boxing match on television. After the boxing match, the defendant and Johnson drove to the George Washington Carver Grand Lodge (Lodge), a black social and community organization of which both the defendant and Johnson were members. The defendant was employed at Boston City Hospital as a security guard and had been at work prior to leaving to watch the boxing match. He was dressed in his security uniform consisting of dark trousers with a stripe down each pant leg, an outer jacket, and a police-style cap with a badge on it.

Johnson and the defendant arrived at the Lodge around 10:30 P.M., but they remained in the automobile in the parking lot for approximately twenty minutes. Thereafter, the defendant entered the den portion of the Lodge, a part of the Lodge reserved for members and their guests. Johnson, who was the head of security for the Lodge, remained in the automobile, watching the parking lot. Later, Johnson also entered the den area. The other portion of the Lodge building was rented for a dance that evening to an Hispanic group.

During most of the evening, the defendant sat at the bar in the den and talked with friends. Some time around 2 A.M. on November 26, 1983, Willie Young, a female acquaintance of the defendant, asked him to escort her to her automobile. The.

---

[1] The defendant argues also that it was error for the judge to instruct the jury on felony-murder. We take this to be a reiteration of his claim that there was insufficient evidence to submit this theory of guilt to the jury, and we address the claim in that context. The defendant makes no argument that the charge, as given, was flawed.

defendant followed her to her automobile shortly thereafter, and the two sat in the vehicle listening to music. About this same time, the dance in the Lodge ended.

While sitting in her automobile, Willie Young noticed a young man walking across the street toward the Lodge, carrying a case of beer. She asked the defendant to inquire of the man carrying the case of beer how much he wanted for it. The man responded, "$15." She told the defendant that was too much, and that she knew where she could get it for $12.99. The defendant and Willie Young remained in the automobile for a few more minutes, and then the defendant left the automobile and walked toward the Lodge.

At approximately this time Jose F. Liriano, a musician who had been playing at the dance, was in the unlit parking lot of the Lodge loading his equipment in his automobile. Liriano saw three people. Angel Luiz Ortiz (the victim) and another person (who has not been identified) were struggling with a security guard over a case of beer. Liriano heard Ortiz say, "[H]e took my box of beer which is mine." Liriano then heard the security guard say, "[T]ake it," as he let Ortiz have the beer. Immediately thereafter, Liriano saw the security guard pull a gun from his left side and shoot Ortiz.[2] Liriano did not see the security guard's face. He testified, however, that "someone said, 'look, that guard shot at him, killed him,'" and that "[t]hey were saying, 'that security guard, that security guard killed Angel.'"[3] After the shooting, Liriano saw the security guard walk toward the street in front of the Lodge.

Victor Vazquez was at the Lodge helping to manage the dance. Hearing a shot, Vazquez left the Lodge and went out to the parking lot. Vazquez saw ten to twelve people standing around the victim and asked the people "what happened." Vazquez testified that Liriano said, "That security guard killed that boy."[4] Someone in the group surrounding Ortiz pointed at

---

[2] All of the testimony indicated that the defendant is right-handed.

[3] The defense did not object to these statements by Liriano.

[4] The defense made a timely objection to this evidence.

the security guard. Vazquez followed the security guard out of the parking lot and watched him get in the passenger seat of an automobile. He, too, never saw the face of the security guard, but, as the automobile drove by him, he saw the security guard in the automobile. He wrote the registration number of the automobile in the palm of his hand. The registration number which Vazquez recorded was that of an automobile registered to Willie Young.

Willie Young testified that, after the defendant left her automobile, he returned about five minutes later and asked her to drive him home. She dropped the defendant off at the corner of Seaver Street and Blue Hill Avenue in Boston. The defendant walked the rest of the way home and got his van. He returned to the Lodge and spoke to one of the police officers at the scene of the shooting.

The remainder of the Commonwealth's case consisted of testimony by several police officers of statements made to them by the defendant. Sergeant Vincent Donohoe of the Boston police department testified that the defendant said that he had heard about the shooting when someone from the Lodge had called him at his home. Detective Edward Doyle of the Boston police department testified that the defendant said that Willie Young was "lying" when told that Willie Young said she drove him away from the Lodge. Detective Peter J. O'Malley of the Boston police department testified that the defendant told him three stories. First, the defendant said that he went to the Lodge and left alone before it closed. Next, the defendant admitted being in Willie Young's automobile and leaving with her. Third, the defendant said he was in Willie Young's automobile when he heard a gunshot. The defendant said that he went to investigate and saw two men get in a Thunderbird automobile and "take off."

The defendant took the stand on his own behalf. His testimony largely parallels that of the Commonwealth's witnesses to the point where the defendant and Willie Young were sitting in her automobile. He testified, however, that no one came by carrying a case of beer, and no inquiry as to the price of a case of beer was made. The defendant said he heard a gunshot

while he was sitting in Willie Young's automobile and proceeded to investigate. He went to the parking lot and asked the people standing around the victim what was happening. People responded, "Me no savy. Me no speak English." The defendant saw two automobiles, one a Thunderbird, leaving the parking lot. The defendant observed the last four digits of the registration number of a third automobile as it left the parking lot. He got into Willie Young's automobile and asked her to follow the third automobile. By the time the defendant got to Willie Young's automobile, the third automobile was out of sight. The defendant denied making many of the statements attributed to him by the police officers.

The victim died of a gunshot wound to the head. A .32 caliber bullet was retrieved from the victim's body. The defendant had a license for, and owned, a .38 caliber handgun. Johnson, Willie Young, and other witnesses testified that throughout the entire evening they never observed the defendant with a gun or a holster.

1. *Individual voir dire.* The defendant contends that the judge's denial of his motion to examine individually each prospective juror for possible racial bias and prejudice violated G. L. c. 234, § 28, and the defendant's constitutional right to be tried by an impartial jury.[5] The defendant claims that, because this was a violent crime and the defendant and the victim were of different racial groups, there was a significant possibility that the jurors would be biased. Although the judge denied the defendant's motion for an individual voir dire, she told the prospective jurors that there would be some Hispanic and black witnesses, and some black witnesses who were members of the Masonic Lodge. Three prospective jurors indicated that they would be prejudiced against Hispanics or blacks, and they were excused.

---

[5] The defendant bases his constitutional claims on the Sixth and Fourteenth Amendments to the Constitution of the United States, as well as art. 12 of the Declaration of Rights of the Massachusetts Constitution. The defendant, however, makes no distinct argument under art. 12. Thus, we consider this claim to be waived, in light of the requirements of Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

The second paragraph of G. L. c. 234, § 28,[6] on which the defendant relies, requires a judge to examine a juror individually and outside the presence of the other members of the venire, if it appears to the judge that the juror may be affected by an extraneous issue, such as race. The judge's actions will be upheld unless she has abused her discretion. *Commonwealth v. Hobbs,* 385 Mass. 863, 873 (1982). *Commonwealth v. Shelley,* 381 Mass. 340, 352-353 (1980). However, a refusal by a judge to examine a juror in the face of a "substantial risk" of bias is an abuse of discretion. *Commonwealth v. Hobbs, supra. Commonwealth v. Shelley, supra* at 352.

In cases involving racial prejudice, more specific limits have been imposed on the judge's discretion. In *Commonwealth v. Sanders,* 383 Mass. 637 (1981), a black defendant was being

---

[6] General Laws c. 234, § 28 (1986 ed.), provides: "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead. In a criminal case such examination shall include questions designed to learn whether such juror understands that a defendant is presumed innocent until proven guilty, that the commonwealth has the burden of proving guilt beyond a reasonable doubt, and that the defendant need not present evidence in his behalf. If the court finds that such juror does not so understand, another shall be called in his stead.

"For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination may include a brief statement of the facts of the case, to the extent the facts are appropriate and relevant to the issue of such examination, and shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

tried for the rape of a white woman, and in *Commonwealth
v. Hobbs, supra,* a black defendant was accused of assaulting
and sexually abusing two white children. In both cases, we
stated that, in such circumstances, a trial judge must question
each juror individually, and out of the hearing of the venire,
about the possibility of racial bias and prejudice. *Sanders,
supra* at 640-641. *Hobbs, supra.*[7]

The defendant argues that, as a matter of essential fairness,
the rule should be applied in this case, a case involving inter-
racial murder. He claims that the circumstances present in
*Sanders, supra,* and *Hobbs, supra,* are also present here, a
violent crime, and the defendant and the victim of different
races. Thus, he claims that the case was as likely to involve
racial bias and prejudice as *Sanders* and *Hobbs.*

We have rejected such claims in the past, absent some special
showing of potential bias. See, e.g., *Commonwealth* v. *Moffett,*
383 Mass. 201, 214 (1981) (armed robbery and assault by
means of a dangerous weapon; mere fact that victim and defend-
ant are of different races or bald assertion of racial tension
does not raise issue of racial bias); *Commonwealth* v. *Campbell,*
378 Mass. 680, 695-696 (1979) (murder; individual voir dire
not required in absence of demonstrated risk of decision on
extraneous grounds); *Commonwealth* v. *Lumley,* 367 Mass.
213, 216-217 (1975) (no constitutional requirement of indi-
vidual voir dire absent factors showing defendant a special
target for racial prejudice). In *Lumley,* however, we stated that
"as a practical matter, when a motion that prospective jurors
be interrogated as to possible prejudice is presented, we believe
the trial judge should grant that motion." *Id.* at 216. Later, in
*Sanders* and *Hobbs,* we extended that suggestion to a mandate

---

[7]The principles stated in both cases were closely circumscribed by the
facts of the cases. *Sanders, supra,* stated that a judge must question each
juror in cases involving an interracial rape, and *Hobbs, supra,* stated that
questioning must occur in cases where there are interracial sexual offenses
against children. In neither case was reversal required. The rules were
applied only to future cases. Neither case rests on constitutional grounds,
but, rather, each relies on our superintendency powers to implement the
statutory policy set forth in G. L. c. 234, § 28. See *Sanders, supra* at
640-641; *Hobbs, supra.*

in interracial cases of sexual violence. We believe it time to adopt, as a matter of our supervisory power, the essence of the rule, stated by the plurality, in *Rosales-Lopez* v. *United States,* 451 U.S. 182, 190 (1981), "that questions directed to the discovery of racial prejudice be asked in certain circumstances in which such an inquiry is not constitutionally mandated." Thus, for the future, we expand the principle we stated in *Sanders* and *Hobbs* and shall require that a trial judge "must make such an inquiry when requested by a defendant accused of [murder] and where the defendant and the victim are members of different racial . . . groups." *Rosales-Lopez, supra* at 192. We reach this posture because our observation informs us that in such instances there is a "'reasonable possibility' that racial prejudice would influence the jury," *id.,* and because we believe such a stance to be in furtherance of the statutory policy expressed in G. L. c. 234, § 28, second par.[8] Further, we consider this step to be a logical extension of the principles expressed in *Sanders* and *Hobbs.* In future murder trials involving a defendant and a victim of different races, the procedure outlined in *Sanders,* and reaffirmed in *Hobbs,* must be applied.

---

[8] While the *Rosales-Lopez* plurality stated a broader rule applying to all "crimes of violence" and to "ethnic," as well as racial, groups, we feel that we should adhere to the basic precepts set forth in *Sanders.* State courts deal with a diversity of crimes greater than those involved in the Federal courts. The crimes "of violence" in our State may involve a range from a minor misdemeanor (assault and battery) to murder, a major felony. Thus, in this context, we take a more cautious course in extending the principles of *Rosales-Lopez* and *Sanders.* *Sanders* was a case involving a victim and a defendant of different races and involved a major crime of violence, namely rape. The facts of this case involve an interracial murder. Thus, we limit our rule and leave the application of the principles embedded in G. L. c. 234, § 28, in other instances, to the sound discretion of our trial judges.

We reiterate that, before such an inquiry is made of prospective jurors, the judge should assure himself by colloquy with the defendant that the defendant personally wishes such inquiry with understanding that the question "may activate latent racial bias in certain prospective jurors or may insult others without uncovering evidence of bias in hard-core bigots who refuse to acknowledge their prejudice." *Commonwealth* v. *Rivera,* 397 Mass. 244, 251 (1986), quoting *Commonwealth* v. *Lumley, supra* at 217. See *Commonwealth* v. *A Juvenile (No. 2),* 396 Mass. 215, 223-224 (1985).

The defendant claims, however, that he is entitled to the benefit of such a rule, based on, he says, a constitutional requirement of individual voir dire of prospective jurors. We disagree. The Supreme Court of the United States has addressed the issue of constitutionally mandated voir dire in three major cases. *Ham* v. *South Carolina,* 409 U.S. 524 (1973). *Ristaino* v. *Ross,* 424 U.S. 589 (1976). *Rosales-Lopez* v. *United States, supra.* In only one of those cases has the Court held that the Fourteenth Amendment's requirement for fairness mandated that the trial judge question prospective jurors as to racial prejudice. That case was *Ham* v. *South Carolina, supra.*[9]

Since *Ham,* the Supreme Court of the United States has stated that "[t]he Constitution does not always entitle a defendant to have questions posed during *voir dire* specifically directed to matters that conceivably might prejudice veniremen against him." *Ristaino* v. *Ross, supra* at 594. Rather than being a rule of universal applicability, constitutionally mandated voir dire is required only where racial issues are "inextricably bound up with the conduct of the trial." *Ristaino* v. *Ross, supra* at 597. Thus, in both *Ristaino* v. *Ross, supra* (black defendant charged with armed robbery and assault and battery of a white security guard), and *Rosales-Lopez* v. *United States, supra* (Hispanic defendant who lived with white woman tried for his participation in smuggling Mexican aliens into the country), the Court found none of the "special circumstances" that elevated the *Ham* case to one of constitutional dimension. The defendants in *Ristaino* and *Rosales-Lopez* were not special targets of racial prejudice. See *Commonwealth* v. *Sowers,* 388 Mass. 207, 213 (1983); *Commonwealth* v. *Ross,* 363 Mass. 665, 672, cert. denied, 414 U.S. 1080 (1973), habeas corpus

---

[9]The defendant in *Ham, supra* at 525, was charged with possession of marihuana. He had no prior criminal record and had been extremely active in the local civil rights movement. His defense was that he "had been framed" on the drug charge, and the police were "out to get him" because of his civil rights activities. Prior to the judge's voir dire of prospective jurors, defense counsel requested that the judge ask the jurors questions about possible prejudice against the defendant. The trial judge refused to ask the questions presented by defense counsel, but did ask general questions relating to bias.

granted sub nom. *Ross* v. *Ristaino,* 388 F. Supp. 99 (D. Mass.), aff'd, 508 F.2d 754 (1st Cir. 1974), rev'd 424 U.S. 589 (1976); *Commonwealth* v. *Core,* 370 Mass. 369 (1976); *Commonwealth* v. *Lumley, supra.* Turning to the case at bar, the mere fact that the defendant and the victim are of different races does not impose constitutionally mandated voir dire on the issue of race. *Commonwealth* v. *Hobbs,* 385 Mass. 863, 874 (1982). Nothing in the record indicates that the defendant was a special target of racial bias, and the subject of racial prejudice was not at issue in the trial. There was no constitutional requirement for voir dire on the issue of racial or ethnic bias. Therefore, we conclude that the judge, acting under the law extant at the time of trial, committed no error by denying the defendant's motion for individual voir dire.

2. *Peremptory challenges.* The defendant contends that the prosecutor's use of peremptory challenges violated art. 12 of the Massachusetts Declaration of Rights and the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

After the judge declared the venire to be indifferent, the first sixteen jurors were seated. Four of the sixteen jurors were black, and three of those four were black males. Two of the three peremptory challenges used by the Commonwealth in the first round of challenges were against two black males. The defendant raised a challenge under the rule set forth in *Commonwealth* v. *Soares,* 377 Mass. 461, 488, cert. denied, 444 U.S. 881 (1979). On the record, the judge expressed concern that one of the challenged black male jurors had listed his age as thirty-eight on the juror questionnaire, but appeared to be in his early twenties. The prosecutor stated that he challenged the other black male because the man had the same name and came from the same locale as defense witnesses in an infamous case which the prosecutor had tried. The prosecutor also noted that there remained three young black males in the venire. The judge denied the defendant's motion, noting that two of the jurors who were not challenged in the first round were black.

Later, during the second round of challenges, the defendant used his peremptory challenges to exclude white and Hispanic jurors. The defendant then moved that the entire panel be struck because it did not represent the Boston area in terms of minority percentages. The judge denied the defendant's motion.

The defendant challenged five more jurors and then indicated that he was content with the jury. The Commonwealth then challenged one more black male juror. The defendant again raised a *Soares* motion, and the judge denied the motion. The prosecutor noted for the record that there were seven members of the venire remaining, two of whom were black males. In the end, the Commonwealth used five peremptory challenges, three of which were used to exclude blacks from the jury. The empanelled jury included two black members.[10]

The defendant argues that he was denied trial by an impartial jury because the prosecutor systematically excluded black jurors. The record shows that the prosecutor did not systematically exclude blacks from the jury. The prosecutor used three peremptory challenges against blacks. Two of the members of the jury who were seated and sworn were black, and two more black persons were in the venire. Thus, out of the seven blacks eligible to be seated, the prosecutor challenged three, a far cry from the twelve out of thirteen in the *Soares* case.

Furthermore, in *Commonwealth* v. *Soares, supra,* we said that there was no misuse of peremptory challenges if the prosecutor's reasons for excluding a juror were personal to the juror and not based on the juror's group affiliation. "[The prosecutor must] demonstrate, if possible, that the group members disproportionately excluded were not struck on account of their group affiliation. While [the prosecutor] need not ap-

---

[10] By the time of deliberations, both black members of the petit jury were excused. One member was excused because a default warrant was executed against him. The other remaining black member was excused when she broke her shoulder. An all-white jury determined the verdict. The defendant moved for a mistrial based on his previous *Soares* motions, arguing that the defendant was not being tried now by a jury fairly representing the community. The argument is without merit. We do not consider the principles stated in *Soares* to constitute a guarantee against fortuitous events such as these.

proximate the grounds required by a challenge for cause, his reason must pertain to the individual qualities of the prospective juror and not to that juror's group association." *Soares, supra* at 491. The prosecutor's explanation and the trial judge's comments support the conclusion that the prosecutor did not improperly exclude blacks from the jury.

The defendant's Fourteenth Amendment argument fails for similar reasons, see *Batson* v. *Kentucky,* 476 U.S. 79 (1986), applied retroactively to cases pending on direct review, *Griffith* v. *Kentucky,* 479 U.S. 314 (1987).[11]

3. *Hearsay statements.* The defendant contends that out-of-court statements made by nonwitnesses were erroneously allowed as evidence. On direct examination by the prosecutor, Vazquez was asked about what had happened after he heard the gunshot and went out to the parking lot to the victim. The colloquy was as follows:

THE PROSECUTOR: "How much time passed from the time you heard the shot to the point in time when you stepped through that door out into the parking lot?"

THE WITNESS: "Just seconds."

THE PROSECUTOR: "When you stepped out into that parking lot, you asked that question, 'What happened?' Is that correct?"

THE WITNESS: "Yes."

THE PROSECUTOR: "When you asked that question, you heard more than one voice, is that correct?"

THE WITNESS: "Yes."

THE PROSECUTOR: "At that point, did you see Jose Liriano?"

THE WITNESS: "Yes."

THE PROSECUTOR: "Did Jose Liriano, at that time, did he say anything?"

THE WITNESS: "When I asked the question, Jose was one of the ones who told me what happened, I know that."

THE PROSECUTOR: "What did he say?"

DEFENSE COUNSEL: "I object, Your Honor."

---

[11] *Batson* adds nothing new to the law already established in this Commonwealth. The analysis in *Batson, supra,* is similar to the analysis in *Soares, supra,* albeit on different constitutional grounds.

THE JUDGE: "No, the objection's overruled. Go ahead."

THE PROSECUTOR: "What did Jose Liriano say?"

THE WITNESS: " 'That security guard killed that boy.' It was him and a couple of voices —."

The defendant argues that this statement, "That security guard killed that boy," was inadmissible hearsay. That the statement is hearsay is not contested by the Commonwealth. Rather, the Commonwealth asserts that the statement falls within the spontaneous utterance (res gestae) exception to the hearsay rule. "The [spontaneous utterance] rule now is that a statement is admissible if its utterance was spontaneous to a degree that reasonably negated premeditation or possible fabrication and if it tended to qualify, characterize, and relate to the underlying event." P.J. Liacos, Massachusetts Evidence 351 (5th ed. 1981 and Supp. 1985). See *Commonwealth* v. *Clary,* 388 Mass. 583, 589 (1983); *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 222-225 (1973).

The statement was made within seconds of the shooting by a person (Liriano) who saw the shooting, and the statement relates to the shooting. The record shows no indication that the statement was premeditated or fabricated. In making determinations as to spontaneous utterances a judge is given broad discretion. See P.J. Liacos, *supra,* and *Commonwealth* v. *McLaughlin, supra* at 223. The judge did not abuse her discretion in admitting this statement.

The statements to which the defendant next objects occurred while Liriano was testifying during the prosecutor's case-in-chief. After Liriano related that he saw the security guard pull out a gun and shoot the victim, the following colloquy took place:

THE PROSECUTOR: "After the security guard shot [Ortiz], and while he was moving, did you hear anybody saying anything?"

THE WITNESS: "At that moment, [Vazquez] came and when he came, then someone said, 'look, that guard shot at him,' 'killed him, killed him.' The security guard."

Later, during Liriano's testimony he was asked:

THE PROSECUTOR: "Was — were they, the people gathering around [Ortiz], were they saying anything in Spanish?"

THE WITNESS: "Yes. They were saying, 'that security guard,' 'that security guard killed [Ortiz].'"

Defense counsel did not object to either statement. Generally, we do not consider issues which were not preserved at trial. *Commonwealth* v. *Marchionda*, 385 Mass. 238, 242 (1982). *Commonwealth* v. *Haywood*, 377 Mass. 755, 766 n.13 (1979). Absent objection, we review only to determine whether a substantial likelihood of a miscarriage of justice exists. G. L. c. 278, § 33E (1986 ed.). *Commonwealth* v. *Lennon*, 399 Mass. 443, 448 n.6 (1987). The hearsay evidence was consistent with the eyewitness account given by Liriano and the testimony of Vazquez, given without objection. Thus, the hearsay statements elicited during Liriano's testimony, to which there was no objection, were cumulative. The error, if any, created no likelihood of a miscarriage of justice.

4. *Sufficiency of the evidence*. The Commonwealth proceeded on two theories of murder in the first degree: deliberate premeditation and felony-murder. At the close of the Commonwealth's case, and again at the close of all evidence, the defense moved for a required finding of not guilty. The judge denied both motions. The defendant argues now that the Commonwealth did not sustain its burden of proof on either theory of murder in the first degree.

The standard we use in reviewing the propriety of a judge's denial of a motion for a required finding of not guilty is: "[W]hether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Amado*, 387 Mass. 179, 186 (1982), quoting *Commonwealth* v. *Basch*, 386 Mass. 620, 622 (1982). *Commonwealth* v. *Toney*, 385 Mass. 575, 582 (1982).

Reviewing the evidence set out in the beginning of this opinion in a light most favorable to the Commonwealth, we conclude that the evidence was sufficient to prove that a homicide was committed in the course of an attempted armed robbery, the felony-murder theory. The evidence warrants a

finding that, at approximately 2:30 A.M., the defendant, dressed in a security guard uniform, left Willie Young's automobile and walked toward the Lodge. Liriano saw a struggle over a case of beer between the victim and an English-speaking security guard. Liriano heard the victim say that the security guard was taking his (the victim's) beer. The security guard took out a gun and shot the victim and then walked to Willie Young's automobile. Shortly thereafter, the defendant left the Lodge in Willie Young's automobile.

A defendant who kills a victim in the commission, or attempted commission, of a robbery while the defendant is armed with a gun is guilty of felony-murder. G. L. c. 265, § 1 (1986 ed.). *Commonwealth* v. *Evans,* 390 Mass. 144, 151 (1983). The evidence was sufficient to sustain the Commonwealth's burden of proving that the homicide occurred in the course of robbery or attempted robbery.

The judge submitted special questions to the jury on the murder indictment. See *Commonwealth* v. *Licciardi,* 387 Mass. 670, 675-677 (1982). The jury found the defendant guilty of murder in the first degree on both the deliberate premeditation and felony-murder theories. Because of our conclusion that there was sufficient evidence for the jury to find the defendant guilty of felony-murder, we need not address whether the evidence was sufficient as to the deliberate premeditation theory. *Commonwealth* v. *Shine,* 398 Mass. 641, 653-654 (1986).

5. *Discharge of deliberating juror.* The final issue raised by the defendant challenges the judge's decision not to discharge a deliberating juror. On the second day of deliberations, one juror notified a court officer that he (the juror) was concerned about being a juror and indicated that he had walked by the defendant at Boston City Hospital on a number of different occasions. Upon being informed of this, the judge told the jury to stop deliberating, and she separated this juror from the others. The judge then held a lobby conference, attended by the attorneys and the juror, and questioned the juror. The juror stated that he remembered seeing the defendant and a

couple of the witnesses when the juror worked at the hospital.
He also said that having seen the defendant "would make me
think different towards him." The judge closely questioned the
juror on this, and he responded, "I'd rather not know him at
all, like, never seen him before in my life." The judge took
the matter under consideration and then, in another lobby con-
ference, stated: "I've considered his demeanor as well as the
way he presented himself to me, and nothing has changed my
thoughts that he is simply a reluctant juror — not for the reason
that he's not impartial. I find that he is impartial, but I think
that he just doesn't want to do his job as a juror." The judge
talked to the juror and, telling him that she thought he could
be impartial, had him continue deliberating.[12]

General Laws c. 234, § 26B (1986 ed.), provides in pertinent
part: "If, at any time after the final submission of the case by
the court to the jury and before the jury has agreed on a verdict,
a juror dies, or becomes ill, or is unable to perform his duty
for *any other good cause shown to the court,* the court *may*
order him to be discharged . . ." (emphasis supplied). The
discharge of a deliberating juror is a sensitive undertaking and
is fraught with potential for error. It is done only in special
circumstances and with special precautions. *Commonwealth*
v. *Connor,* 392 Mass. 838, 843 (1984). The judge followed
our instructions in *Commonwealth* v. *Haywood,* 377 Mass.
755, 769-770 (1979): "[B]efore a juror is excused from delib-
erations and replaced by an alternate juror, the judge should
hold a hearing and be fully satisfied that there is a meritorious
reason why a particular juror should not continue to serve. . . .
The judge then should consider whether, in view of all the
circumstances, an alternate juror should be substituted." See
*Commonwealth* v. *Connor, supra* at 844. The judge determined
that no good cause was shown necessitating the discharge of
the juror; there was no abuse of her discretion in retaining the
juror.

---

[12] The judge also told the juror not to discuss anything that had happened
with the other jurors.

6. *Review pursuant to G. L. c. 278, § 33E.*   General Laws c. 278, § 33E, confers upon this court the power to order a new trial or to direct entry of a verdict of a lesser degree of guilt where such action is warranted. We find nothing in the ·record indicating that an error of law was made, see, e.g., *Commonwealth* v. *Cole,* 380 Mass. 30, 39 (1980), or that the verdict was against the weight of the evidence, see, e.g., *Commonwealth* v. *Jones,* 366 Mass. 805, 809 (1975), and thus we affirm the judgment.

*Judgment affirmed.*